Daisy E. LAMPKIN, et al., Plaintiffs,

v.

John T. CONNOR, Secretary of Commerce, United States Department of Commerce, et al., Defendants.

Civ. A. No. 1355–63.

United States District Court
District of Columbia.

March 29, 1965.

William B. Bryant, Washington, D. C., Jack Greenberg, Michael Meltsner, New York City, for plaintiffs.

John W. Douglas, Asst. Atty. Gen., David C. Acheson, U. S. Atty., J. William Doolittle, Atty., Dept. of Justice, for defendants.

WILLIAM B. JONES, District Judge.

Two groups of plaintiffs joined in filing the complaint in this action. Group 1 consists of fifteen persons who assert that they are citizens of the United States, over 21 years of age, and that they are and have been duly registered

voters for all general elections in their respective States. One is a citizen of the State of Pennsylvania; two are citizens of the State of Massachusetts; six are citizens of the State of Missouri; two are citizens of the State of Illinois; two are citizens of the State of Ohio; and two are citizens of the State of California.

Group 2 plaintiffs consist of ten persons who allege that they are citizens of the United States, over 21 years of age, and that they are eligible to vote in their respective States but that they are unable to vote because of their failure to meet one or more of the following requirements: (1) The State of Virginia requirement that an application to register to vote must be in one's own handwriting; (2) the requirement of the State of Virginia and of the State of Mississippi of the payment of poll taxes; (3) the State of Mississippi requirement that a voter pass a constitutional interpretation test administered in a different manner to Negroes than to white persons;[1] and (4) the State of Louisiana requirement that a voter answer questions on a registration form without error of any kind.[2] Five of these Group 2 plaintiffs are Negro citizens of the State of Virginia; four are Negro citizens of the State of Mississippi; and one of the Group 2 plaintiffs is a Negro citizen of the State of Louisiana. All Group 2 plaintiffs assert that the voter-qualification tests and conditions as applied to them by their respective States constitute a denial or abridgment of their right to vote.

All plaintiffs joined in bringing this action on their own behalf and on behalf of all other persons similarly situated. They seek a declaratory judgment against the Secretary of Commerce and the Director of the Bureau of the Census, Department of Commerce.[3]

Plaintiffs' complaint asserts that section 2 of the Fourteenth Amendment to the Constitution; the equal protection clause of the Fourteenth Amendment and due process clause of the Fifth Amendment to the Constitution; 2 U.S.C. § 6 (1958); 2 U.S.C. § 2a (1958); 13 U.S.C. §§ 4, 5, 11, 21 and 141 (1958) require the defendants, in connection with each decennial census, to take necessary steps to prepare and to transmit to the President of the United States a statement showing the number of Representatives to which each State is entitled under section 2 of the Fourteenth Amendment, which provides as follows:

"Section 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime,

1. For a recent consideration of the constitutional interpretation test administered in Mississippi, see United States v. Mississippi, 85 S.Ct. 808 (Mar. 8, 1965).

2. Recently the Supreme Court has affirmed a decision of a United States District Court that Louisiana's pre-1962 constitutional interpretation voter-qualification test violated the Federal Constitution. Louisiana v. United States, 85 S.Ct. 817 (Mar. 8, 1965). It is not clear from the complaint in this action whether it is that now void test about which plaintiffs com-

plain here. For the purpose of this opinion it will be assumed that it is a different discriminatory test.

3. At the time this action was instituted Luther Hodges was Secretary of Commerce and Richard M. Scammon was Director, Bureau of the Census. Since that time John T. Connor has succeeded Hodges and A. Ross Eckler has succeeded Scammon in those offices. A substitution order has been entered. Fed.R.Civ.P. 25 (d) (1).

the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

According to the plaintiffs' complaint the defendants are required by existing law to take a decennial census of the population of the United States for the purpose of apportioning Representatives in Congress among the several States and to report the tabulation of population for that purpose to the President of the United States, whose sole duty is to transmit to the Congress a statement of the number of Representatives to which each State is entitled. And upon receipt of such statement by Congress the House of Representatives is to be apportioned as reported therein. Plaintiffs assert that it is readily possible for defendants as well as their obligation to take steps at the next decennial census to compile figures as to denial and abridgment of the right to vote and to prepare and transmit a statement showing the number of Representatives to which each State is entitled on the basis of such figures. But, according to plaintiffs, the defendants do not intend at the next decennial census to compile such figures and make and transmit such statement.

It is further claimed by plaintiffs that, if upon the taking of the next decennial census, figures were compiled as to the denial and abridgment of the right to vote, it is likely and probable that the resulting reapportionment would give to each of the States in which the Group 1 plaintiffs reside at least one additional Representative in Congress while various other States, including the States in which Group 2 plaintiffs reside, would each lose at least one Representative in Congress.

Group 1 plaintiffs allege that refusal by the defendants to compile and make available the above described reappor-

tionment data in connection with the next decennial census will violate their Constitutional rights. They claim that such reapportionment data is necessary to effectuate the reduction in the number of Representatives in Congress from those States which deny and abridge the right to vote and that unless such reduction is accomplished their votes will be debased and diluted to the extent that they will be of less value than the votes of the voters in the States which deny and abridge the right to vote. And Group 2 plaintiffs assert that unless the defendants compile and make available such reapportionment data in connection with the next decennial census their Constitutional rights will be violated. They claim that without that reapportionment data there will be no reduction in the number of Representatives from their respective States and that such reduction or threat thereof is a protection to them in that it will serve as a means of redressing and deterring the denial or abridgment of their right to vote.

All plaintiffs join in requesting this Court to enter a declaratory judgment that, pursuant to the above mentioned Constitutional provisions and statutes, the defendants are required at the next decennial census to compile figures as to the denial and abridgment of the right to vote and to prepare, compile and compute for transmittal to Congress an apportionment of the House of Representatives based on such figures. And, alternatively, all plaintiffs request the Court that, if it should be determined that any one or more existing statutes provide for the preparation, compilation, computation and transmittal of an apportionment in any other manner, such statutes be declared unconstitutional to the extent that they do not require defendants to comply with the provisions of section 2 of the Fourteenth Amendment to the Constitution and 2 U.S.C. § 6 (1958).[4]

Defendants have moved to dismiss the complaint or, in the alternative, for sum-

---

4. Since plaintiffs do not seek an injunction to restrain the enforcement, operation or execution of any Act of Congress, a three-judge District Court need not be convened. 28 U.S.C. §§ 2282 (1958), 2284 (Supp. V, 1964).

mary judgment on the grounds that: (1) plaintiffs lack standing to sue; (2) the complaint fails to state a justiciable controversy; and (3) the complaint should be dismissed for want of equity.

Both plaintiffs and defendants have filed memoranda briefs and the Court has heard oral argument by counsel.

## I

In considering plaintiffs' complaint and the relief they seek, it is well to again recall the words of Justice Frankfurter in his concurring opinion in Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 150, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951):

"Limitation on 'the judicial Power of the United States' is expressed by the requirement that a litigant must have 'standing to sue' or, more comprehensively, that a federal court may entertain a controversy only if it is 'justiciable.' Both characterizations mean that a court will not decide a question unless the nature of the action challenged, the kind of injury inflicted, and the relationship between the parties are such that judicial determination is consonant with what was, generally speaking, the business of the Colonial courts and the courts of Westminster when the Constitution was framed. The jurisdiction of the federal courts can be invoked only under circumstances which to the expert feel of lawyers constitute a 'case or controversy.' The scope and consequences of the review with which the judiciary is entrusted over executive and legislative action require us to observe these bounds fastidiously."

■ Unless the plaintiffs have standing to sue "or, more comprehensively", unless their complaint states a justiciable case or controversy, this Court cannot entertain their plea for assistance. An examination of the rights claimed by the plaintiffs, and of the asserted effect upon those rights because of the refusal of defendants at the time of the next decennial census to compile and make available reapportionment data in the manner demanded by plaintiffs, leads to but one conclusion: the complaint must be dismissed.

■ Group 1 plaintiffs assert that there has been and, unless the relief sought here is obtained, there will continue to be apportioned to States, of which they are not citizens, seats in the House of Representatives to which those States are not entitled because they abridge and deny the right to vote of large numbers of citizens. According to these Group 1 plaintiffs, such malapportionment results in debasing and diluting their right to vote. To rectify this condition and to restore true value to their votes they would have the illegally-apportioned House seats reapportioned as required by section 2 of the Fourteenth Amendment to the Constitution.

But assuming that this Court were to construe the census-taking statutes as requiring defendants to compile and transmit the reapportionment data requested by plaintiffs, it would be sheer speculation that such data would result in the acquisition of one or more House seats by any one, let alone all of the States in which Group 1 plaintiffs reside. While 13 U.S.C. § 141(b) (1958) directs the Secretary of Commerce to report the census tabulation of total population by States as required for the apportionment of Representatives, section 2a(a) of Title 2 U.S.C. (1958) provides that the President shall transmit to Congress a statement evidencing such population "and the number of Representatives to which each State would be entitled under an apportionment * * * by the method known as the method of equal proportions * * *." Until the population of each State was computed in the manner plaintiffs request, the "method of equal proportions" could not be applied to the population figures of each of the fifty States. Through the application of that formula there would be determined the parity or disparity of each State with every other State with respect to representation per population. The resulting reapportionment could add to, take away from, or

even leave unaffected the number of House seats presently apportioned to the States in which Group 1 plaintiffs reside.[5]

And while Group 1 plaintiffs allege that defendants know or should know that it is "likely and probable" that the States in which Group 1 plaintiffs reside would each receive "at least one additional Representative in Congress" through the reapportionment method they desire, they recognize in their Memorandum in Opposition to Defendants' Motion that such a result is speculative. There they state (p. 9):

> "The results of an apportionment in accordance with the provisions of § 2 [Fourteenth Amendment] are dependent totally on patterns of denial and abridgment of the franchise throughout the country. An apportionment consistent with § 2 may result in a small number of states gaining Representatives, a small number losing, and a large number remaining the same; or a small number of states may lose a large number of Representatives each and a large number of states may gain a small number of Representatives each. It may or may not be limited to inhabitants of a "few thinly populated states" (Defendants' Memo. p. 7) depending on whether and to what extent such states deny or abridge the right to vote and whether and to what extent other, more populous, states deny or abridge the right to vote."

The complaint of Group 1 plaintiffs that their votes are debased and diluted in value is a condition they share in common with citizens of all States where the right to vote is neither abridged nor denied. Thus what the Group 1 plaintiffs would have this Court do is decide a question and afford a remedy as to which their interest is remote and speculative and shared by millions of others. They are not personally aggrieved or affected in a legal sense by defendants' refusal to take future action in connection with the 1970 census in the manner these plaintiffs demand. They lack standing to sue. Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed 1078 (1923); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Pennsylvania R. R. v. Dillon, 118 U.S.App. D.C. 257, 335 F.2d 292 (1964); United States ex rel. Brookfield Const. Co. v. Stewart, 234 F.Supp. 94 (D.D.C.1964).

■ Nor are the Group 2 plaintiffs in any better legal position than those of Group 1. They assert that they, as well as others in their States, have suffered and will continue to suffer the denial or abridgment of their rights to vote for reasons other than participation in rebellion or other crime. Because of this condition they seek the assistance of this Court to require defendants to so compile census data that their respective States would lose seats in the House of Representatives. But assuming that defendants were compelled to take such action and that a reapportionment gave existing House seats to other States, that result would not vindicate their right to vote. They would find themselves in the same position that they are in at this time.

But Group 2 plaintiffs argue that granting the relief sought here would bring about a change in existing conditions. They claim that a reduction in the number of Representatives from their respective States, or even the threat thereof, would serve as a means of redressing and deterring the denial or abridgment of their right to vote. But such a possibility is both remote and speculative. These plaintiffs do not and could not assert that it is the Secretary of Commerce and the Director of the Bureau of

---

5. For one explanation of the method of equal proportions by an authority, see Huntington, Memorandum on the Method of Equal Proportions, 70 Cong.Rec. 4965–66 (1929). See also Report to the President of the National Academy of Sciences, id. at 4966–67; Chafee, Congressional Reapportionment, 42 Harv.L.Rev. 1015, 1032–35 (1929).

the Census—the defendants here—who have barred them from exercising their right to vote. Insofar as that right has been denied or abridged, it resulted from the alleged action of state officials; but they are not parties to this suit. Whether those States, faced with the loss of Representatives, would remove the asserted barriers to voting is problematical. Poll taxes and voter-qualification tests are long standing conditions to voting in certain States, including those in which Group 2 plaintiffs reside. To consider whether those conditions would be removed if the relief sought here were granted would be to engage in a conjectural exercise that could not bring about that certainty required for standing to sue. In short, the interest of Group 2 plaintiffs is not so "direct and immediate" as to justify the relief they seek. Massachusetts v. Mellon, 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

Both Group 1 and Group 2 plaintiffs argue that the conclusion reached here—that they have no standing to sue—is contrary to recent Supreme Court decisions. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691 (1962); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964); WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Maryland Comm. for Fair Representation v. Tawes, 377 U. S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. 44th General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). In each of these cases plaintiffs had standing to sue.

In Wesberry alone was the Court treating with a seat in the House of Representatives. There the plaintiffs were voters in the State of Georgia. Their suit was against State election officials. Their claim was that a Georgia statute so malapportioned the Congressional districts in Georgia that the district in which they resided was proportionately so much larger in population than the other districts that their votes were debased and diluted in value. No question was raised as to the proper apportionment of Representatives between the several States. The issue did not include a determination of whether Georgia would gain or lose House seats. The plaintiffs asked the Court to declare the state statute invalid and enjoin the state officials from conducting elections under it. There was, in other words, nothing remote or speculative about the action brought by Wesberry and his fellow plaintiffs.

In Gray v. Sanders, again the plaintiffs were voters of the State of Georgia and the defendants were state officials. At issue was the constitutionality of a state statute making the county unit system applicable to statewide primary elections. That system according to plaintiffs diluted the value of votes of some voters solely because of their place of residence in the State of Georgia. Here again there was nothing remote or speculative about the rights asserted nor in the ruling sought.

The other above cited cases involved the constitutionality of the apportionment of state legislatures—in some instances only one house of a bicameral legislature; in other cases, both houses. Again the plaintiffs were directly affected voters suing officials of their States and claiming that their votes had been diluted in value because of malapportionment of state legislatures under state statutes. There was nothing remote or speculative about either the rights they asserted or the relief they sought.

Nor are Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), Koenig v. Flynn, 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805 (1932), Ohio ex rel. Davis v. Hildebrant, 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916), Carroll v. Becker, 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807 (1932), and Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932) authorities for holding that plaintiffs here

have standing to sue. Those actions were brought by voters of the particular States against state officials attacking state action relating to congressional districts within the respective states.

It can be said that in each of the cases cited by plaintiffs there was present "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" and that therefore, there was standing to sue. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691 (1962). But such is not the case here.

Finally, plaintiffs assert that Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) does not sustain a holding that plaintiffs here have no standing to sue. Plaintiffs would distinguish plaintiff Frothingham from themselves in that she sued as a taxpayer while they bring this action as voters. However, the Supreme Court held Frothingham as lacking standing to sue not because she was a taxpayer but rather that the interest she asserted was shared by millions of others, was comparatively minute and indeterminable and "so remote, fluctuating and uncertain, that no basis [was] afforded for an appeal to the preventive powers of a court of equity." 262 U.S. at 487, 43 S.Ct. at 601. Plaintiffs' interest here is no less "remote, fluctuating and uncertain." They lack standing to sue.

II

But even if plaintiffs had standing to sue they could not obtain the relief they seek. Instead, summary judgment would be entered in favor of defendants. This case presents no genuine issue of material facts. Plaintiffs assert that the defendants do not intend at the next (1970)

decennial census to compile figures as to denial and abridgment in the several States of the right to vote for other than criminal activities and to prepare and transmit to the President a statement showing the number of Representatives to which each State is entitled when the disfranchised are excluded from the State's total population. Defendants do not deny this assertion, but rather they claim that they have been neither directed nor authorized to compile such figures and prepare such statement. Plaintiffs contend that there is legislation that makes such activity the duty of defendants. Thus, the controversy here concerns only the question of legal authority without involving a factual dispute. Assuming jurisdiction, this would be a proper case to be disposed of by summary judgment. Dewey v. Clark, 86 U.S.App. D.C. 137, 180 F.2d 766 (1950).[6]

According to plaintiffs' complaint, section 2a of Title 2 U.S.C. (1958) and sections 4, 5, 11, 21 and 141 of Title 13 U.S. C. (1958) impose upon the defendants the duty to take the census and compute Congressional apportionment in the manner contended for by the plaintiffs. But an examination of those sections of the Code reveals that they neither separately nor collectively authorize, let alone direct, the defendants to take the action which plaintiffs request this Court declare defendants must take.

Sections 4, 5, 6, 11 and 21 of Title 13 U.S.C. (1958) provide appropriation authority and authorize the Secretary of Commerce (with power to delegate his duties to the Director of the Census) to prepare schedules and forms for recording statistics and census data; to call upon other Federal government agencies for information; to obtain information by purchase or otherwise from State and

---

6. Plaintiffs contend that the affidavit of defendant Scammon, attached to defendants' motion, and the reply affidavit of Abram J. Jaffe, filed herein by plaintiffs, raise a genuine issue of material fact which precludes the granting of summary judgment. But those affidavits treat with the question of whether procedures could be developed by the Census Bureau which would accomplish the objectives for which plaintiffs contend; they do not relate to whether defendants have authority to determine what voters have had their votes abridged or denied them and to compute Congressional apportionment on the basis of such facts.

local governments, private persons and agencies.[7]

Section 141 of Title 13 U.S.C. (1958), after providing that the Secretary of Commerce shall in 1960 and every ten years thereafter take a "census of population", states: "The tabulation of total population by States as required for the apportionment of Representatives shall be completed within eight months of the census date [April 1] and reported by the Secretary to the President of the United States."

The limitation upon the Secretary's authority in making the "tabulation of total population" is determined by the use made of that work as provided in subsection (a) of section 2a of Title 2 U.S.C. (1958):

"(a) On the first day, or within one week thereafter, of the first regular session of the Eighty-second Congress and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal

proportions, no State to receive less than one Member." [8]

It is to be noted that the President is required to report to Congress the "whole number of persons in each State" with only non-taxed Indians being excluded. Necessarily, the "whole number" includes the disfranchised citizens of the State. Such population figure is "ascertained under the * * * decennial census of the population," that is, the tabulation of total population by States transmitted by the Secretary of Commerce to the President. If the Secretary's tabulation excluded the disfranchised, as plaintiffs contend it must, then the President's "whole number" statement to Congress would also exclude them. This would be contrary to the direction of Congress as set forth in section 2a of Title 2 U.S.C. (1958).

Moreover, neither section 141 of Title 13 U.S.C. (1958), nor any other statutory provision cited by plaintiffs makes any reference to, let alone imposes a duty upon, either of the defendants with respect to computing the apportionment of Representatives. The responsibility for stating to Congress the number of Representatives to which each State would be entitled under an apportionment is placed upon the President alone. 2 U.S.C. § 2a (1958).[9]

The Congress in enacting the Census and Reapportionment Act of 1929 expressed the intention that the Secretary

---

7. While not specifically referred to in their complaint, plaintiffs cite in their Memorandum in Opposition to Defendants' Motion 13 U.S.C. § 13 (1958) and 13 U.S. C.A. §§ 23–25 (1964 Supp.). Those provisions merely authorize the Secretary to contract with educational and other research organizations for the preparation of reports and materials; to employ personnel necessary to carry out the survey and census authorized in Title 13, the employees being obligated to carry out their duties in keeping with the Secretary's instructions including the collection of facts and statistics called for on the schedules prepared or approved by the Secretary.

8. Section 141 of Title 13 U.S.C. (1958) and § 2a of Title 2 U.S.C. (1958) were derived from the Census and Reappor-

tionment Act of 1929, 46 Stat. 21. See § 2 of the 1929 Act, 46 Stat. 21, for the origin of § 141 of Title 13 U.S.C. (1958); see § 22(a) of the 1929 Act, 46 Stat. 26, for the origin of § 2a of Title 2 U.S.C. (1958). While there have been some amendments to the 1929 Act, they are not material here.

9. 2 U.S.C. § 2a (1958) in none of its subsections even refers to the Secretary of Commerce or the Director of the Bureau of the Census. Subsection (b) of that section makes it the duty of the Clerk of the House of Representatives (or under certain circumstances the Sergeant at Arms or the Doorkeeper of the House) to send to the executive of each State a certificate of the number of Representatives to which such State is entitled.

of Commerce and the Bureau of the Census should "count * * * people" while the President, "with [their] figures in hand", would report the census figures together with a table showing "how, under these figures, the House would be apportioned * * *." S.Rep.No. 2, 71st Cong., 1st Sess. 4 (1929).

When the legislation (S. 312) was before the House of Representatives for consideration, Congressman Tinkham of Massachusetts offered several amendments. One of those amendments would have required the Director of the Census to include in each decennial census "the number of inhabitants in each State being 21 years of age and citizens of the United States, whose right to vote at the election next preceding such census for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a State, or the members of the legislature thereof has been denied or abridged except for rebellion or other crime." 71 Cong.Rec. 2271 (1929).

A second Tinkham amendment would have included within the restricted census inquiries one relating "to the denial or abridgment of the right to vote." Id. And the third Tinkham amendment would have the President's statement to Congress exclude from the whole number of persons in each State not only untaxed Indians but also "the number of inhabitants in each State whose right to vote has been denied or abridged." Id.

In giving notice of offering the amendments, Congressman Tinkham stated that they provided "for the carrying out of the provisions of the constitutional amendment [section 2, Fourteenth Amendment] in full in the most practical way possible, namely, the collection of statistics to ascertain as nearly as can be the number of persons who are disfranchised." 71 Cong.Rec. 2271 (1929). At one time during the consideration of the legislation, one of Congressman Tinkham's amendments was adopted by the House. Id. at

2364. But before final passage the amendment was eliminated. Id. at 2483.

Thus, Congress in 1929 denied defendants the authority plaintiffs now claim for those officials. And Congress has not since changed its position.

In enacting the Civil Rights Act of 1964, Congress did grant the Secretary of Commerce authority to collect and compile limited registration and voting statistics. Section 801, Title VIII of the Civil Rights Act of 1964 (78 Stat. 266, 42 U.S.C.A. 2000f). However, the Secretary may not compel any person to furnish any pertinent information as he can when taking the census. 13 U.S.C. §§ 221–225 (1958). The Civil Rights Act of 1964 does not implement section 2 of the Fourteenth Amendment. When under consideration in both the House and the Senate this was made clear. Congressman Stratton expressed this understanding when he stated (110 Cong.Rec. 2768 (1964)):

"Title VIII as it now stands is at least a step in the direction I have proposed that we go, that is, toward the full enforcement of the second section of the 14th Amendment. It does not, however, require an immediate new census nor does it give the Bureau of the Census the authority, as I personally believe it should be given to determine not only the extent of the abridgment of voting rights in this country but also the extent to which the representation of various States must be correspondingly reduced by reason of this voting abridgment." [10]

Both before and since the enactment of the Civil Rights Act of 1964, attempts have been made to implement section 2 of the Fourteenth Amendment. Thus far none has succeeded. As recently as February 17, 1965, Senator McNamara renewed his attempt to enact legislation which would achieve the purpose of section 2. In introducing his bill—S. 1101,

10. For other statements to the same effect, see: (1) in the House, 110 Cong. Rec. 1643–1644, 1904, 2754, 2759 (1964);

(2) in the Senate, 110 Cong.Rec. 6564, 6954 (1964).

89th Congress, 1st Session—he said, "Congress has shirked its responsibility for enforcing this provision [section 2, 14th Amendment] with the legislative machinery."[11]

The courts also have recognized that Congress has never implemented section 2 of the Fourteenth Amendment. In Saunders v. Wilkins, 152 F.2d 235, 237–38 (4th Cir. 1945), cert. denied, 328 U. S. 870, 66 S.Ct. 1362, 90 L.Ed. 1640 (1946), it was said: "It is well known that the elective franchise has been limited or denied to citizens in various States of the union in past years, but no serious attempt has been made by Congress to enforce the mandate of the second section of the Fourteenth Amendment, * * *." See also United States v. Sharrow, 309 F.2d 77 (2d Cir. 1962), cert. denied, 372 U.S. 949, 83 S.Ct. 939, 9 L.Ed.2d 974 (1963) ; Dennis v. United States, 84 U.S.App.D.C. 51, 171 F.2d 986 (1948), aff'd, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950).[12]

■ If plaintiffs had standing to sue I would rule that the Code sections relied on by them do not direct or authorize the defendants to exclude disfranchised citizens in taking the census and to compute a statement showing a reapportionment of Representatives on the basis of such exclusion. But plaintiffs contend that to so hold would require 2 U.S.C. § 2a (1958) and 13 U.S.C. §§ 4, 5, 11, 21 and 141 (1958) to be declared unconstitutional, null and void. Plaintiffs cite no authority for that contention.[13] I have found none. On the other hand, United States v. Sharrow, 309 F.2d 77, 79–80 (2d Cir. 1962), cert. denied, 372 U.S. 949, 83 S.Ct. 939, 9 L.Ed.2d 974 (1963), held: "Irrespective of the Fourteenth Amendment's mandate the Congress, in the present state of the law, is not required to prescribe that census-takers ascertain information relative to disfranchisement. * * * [T]here was nothing unconstitutional in the omission from the census form of a question relating to disfranchisement." And Chief Judge Lumbard stated in his concurring opinion: "There is no language in the Constitution which directs that the Congress designate the census questionnaire as the means to determine disfranchisement. Although the 1960 census may have provided an occasion to make that factual determination, * * * it cannot be said to be the constitutionally required means."

If plaintiffs had standing to sue I would grant defendants' motion for summary judgment.[14] But since they do not I grant defendants' alternative motion to dismiss.

11. For earlier attempts by Senator McNamara as well as other members of Congress to implement § 2, see Zuckerman, A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment, 30 Fordham L.Rev. 93 (1961).

12. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691 (1962); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801 (1963); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362 (1964); WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418 (1964); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449 (1964); Lucas v. 44th General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459 (1964) are not pertinent to the question here. They involved actions against state officials. They did not treat with the manner and by whom the United States decennial census should be taken and whether the Secretary of Commerce and Director of the Bureau of the Census had any duties concerning the apportionment of the House of Representatives.

13. In their complaint as well as in their Memorandum in Opposition to Defendants' Motion, plaintiffs cite 2 U.S.C. § 6 (1958). This section is merely declaratory of § 2 of the Fourteenth Amendment. It does not implement that constitutional provision. Nor does it supply support for plaintiffs' constitutional argument.

14. Kosty v. Lewis, 115 U.S.App.D.C. 343, 348, 319 F.2d 744, 749 (1963).