**Daisy E. LAMPKIN et al., Appellants,**

**v.**

**John T. CONNOR, Secretary of Commerce, et al., Appellees.**

**No. 19383.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 6, 1965.

Decided April 14, 1966.

Mr. Jack Greenberg, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. William C. Gardner, Washington, D. C., James M. Nabrit, III, New York City, William R. Ming, Jr., Chicago, Ill., and A. P. Tureaud, New Orleans, La., were on the brief, for appellants.

Mr. J. William Doolittle, Atty., Dept. of Justice, with whom Asst. Atty. Gen. John W. Douglas, Mr. David C. Acheson, U. S. Atty. at time brief was filed, and Messrs. Morton Hollander and Richard S. Salzman, Attys., Dept. of Justice, were on the brief, for appellee.

Before EDGERTON, Senior Circuit Judge, and FAHY and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

This is an appeal from the dismissal of a complaint under the Declaratory Judgment Act. 28 U.S.C. §§ 2201–2202. Appellants sought in the District Court a determination that appellees, in their official capacities as Secretary of Commerce and Director of the Census, are required to implement the provisions of Section 2 of the Fourteenth Amendment,[1] which contemplates a reduction in the basis of a state's representation in Congress when that state denies or abridges the right to vote. For the reasons appearing hereinafter, we do not reinstate the complaint.

## I

Appellants, who brought this action on behalf of themselves and others similarly situated, Rule 23(a) (3) FED.R.CIV.P., comprise two groups by their own designation. The so-called Group I appellants are registered voters from Pennsylvania, Massachusetts, Missouri, Illinois, Ohio, and California. They assert that, if apportionment were to be effected in accordance with the literal commands of Section 2, the alleged denials and abridgements of the right to vote by certain other states would compel a reduction in the representation of those latter states, and a corresponding increase in the representation of their own. Since appellees do not presently provide the necessary statistical basis for such reapportionment, the Group I appellants claim that (1) their congressmen represent more persons than the congressmen from states which deny or abridge the right to vote, (2) the value of their votes is consequently diluted in violation of their constitutional rights, and (3) enforcement of Section 2 is necessary in order to protect their votes from such dilution.

The remaining appellants classify themselves as Group II. They are citizens of Virginia, Mississippi, and Louisiana, claiming to be qualified voters in all respects except that various discriminatory practices, including literacy tests and poll tax requirements, deprive them of their right to vote. They invoke Section 2 in order to deter the deprivations which they are allegedly suffering.

[1] "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

All appellants point out that, under the relevant statutes,[2] appellees are presently charged with the responsibility for compiling a tabulation of the population for the purposes of representation, preparing a statement showing the representation to which each state is entitled, and submitting that statement to the President for transmittal to Congress.[3] They contend that these laws, properly construed, also require appellees, contrary to their present practice, to take into account whatever reduction in representation may be required by Section 2 of the Fourteenth Amendment; and that, if these statutes be viewed as not embodying this requirement, they must be declared void and of no effect as unconstitutional. The complaint prays for a declaration that appellees are now required (1) to take steps to compile statistics in the 1970 census on the denial and abridgement of the right to vote, and (2) thereafter to prepare an apportionment statement based upon such statistics for submission to the President and ultimate transmittal to Congress. In the event such a reading of the statutes is not made, the complaint asks that the existing statutes relating to the administration of the census and the preparation of the apportionment statement be invalidated.

Appellees filed a timely motion to dismiss or, in the alternative, for summary judgment. This motion asserted that appellants lacked standing to sue, a justiciable controversy was absent, and the complaint failed to state a cause of action for which equitable relief is available.

Attached to the motion was an affidavit of the then Director of the Census to the effect that the compilation of the statistics demanded by appellants was not feasible. In opposing the motion, appellants submitted a counteraffidavit contradicting the Director's assertions in this regard.

The District Court, being of the view that, under Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), both groups of appellants lacked standing to sue, granted the motion to dismiss. As to the Group I appellants, the court regarded as sheer speculation their allegations that increased representation of their states was a likely consequence of the relief sought. In any event, the claimed dilution of the value of their vote was viewed by the court as shared with millions of other voters in other states where the right to vote is neither abridged nor denied. The Group II appellants were thought to be in no better position. The possibility that the relief requested would serve as a meaningful deterrent to the alleged denials and abridgements of voting rights was, to the court, too remote and speculative to found judicial intervention.

Although the order appealed from is limited to a grant of the motion to dismiss, the District Court volunteered the further opinion that, even if appellants had standing, summary judgment in favor of appellees would be appropriate. It did not regard appellees as under a statutory duty to compile the statistics and submit the apportionment statement

2. 2 U.S.C. §§ 2a, 6; 13 U.S.C. §§ 4, 5, 11, 21, 141. 2 U.S.C. § 2a provides that the President shall transmit an apportionment statement to Congress showing the number of representatives to which each state is entitled. 2 U.S.C. § 6 declares that the number of representatives apportioned shall be reduced in accordance with Section 2 of the Fourteenth Amendment. 13 U.S.C. §§ 4, 5, and 141 variously authorize the Secretary of Commerce to take the census, to tabulate "total population by States as required for the apportionment of Representatives * * *," to report

to the President, and to delegate his functions. 13 U.S.C. § 11 authorizes the appropriations needed to carry out these provisions, and 13 U.S.C. § 21 provides for the appointment of a Director of the Census.

3. Appellants assert that "while it is the President who transmits the figures to Congress, he is merely a conduit for the statement prepared, compiled and computed by the Secretary and Bureau of the Census."

demanded;[4] nor did it regard the omission of any such duty as rendering the legislation unconstitutional. United States v. Sharrow, 309 F.2d 77 (2d Cir. 1962), cert. denied, 372 U.S. 949, 83 S.Ct. 939, 9 L.Ed.2d 974 (1963), was cited by the court to support its view that the census machinery was not the constitutionally requisite channel for carrying out the purposes of Section 2 of the Fourteenth Amendment.

## II

Immediately in issue on this appeal is appellants' contention that the District Court erred in dismissing their complaint, either for lack of standing or non-justiciability. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and other reapportionment cases are said to establish beyond any doubt the standing of the Group I appellants to protect the full weight of their right to vote.[5] And the Group II appellants have standing, so it is said, because Section 2 of the Fourteenth Amendment was directed at protecting the very rights of an individual and personal nature which these particular appellants are asserting. If, we are told, these latter appellants do not have standing to invoke Section 2, then it is unlikely that any one does. Contrary to the view of the court below, appellants insist that the threat of breathing life into Section 2 would be of great practical utility in securing greater recognition of their rights to vote. The doctrine of standing does not, in this submission, require a showing of absolute certainty of success.

In response, appellees argue that standing is lacking because the recent civil rights legislation either has removed or is fast removing the barriers to voting of which appellants complain. By the 1970 census it is likely, they contend, that these barriers will be eliminated. Alternatively, they argue that dismissal was proper, even if standing existed, because a non-justiciable question is involved, since apportionment is a duty which has been constitutionally entrusted to Congress, which an unreviewable discretion as to how it is to be accomplished. In enacting the recent civil rights legislation, culminating in the Voting Rights Act of 1965, Congress has selected its own method of insuring the right of all citizens to vote. Whatever Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), did to limit the political question doctrine with respect to the intrusion of the federal judiciary into matters of state government, it is claimed to have no relevance to cases involving the relationship of co-equal branches of the federal government. In any event, the determination of whether, within the meaning of Section 2, an individual has been wrongfully denied his right to vote is said to involve a standard which it would not be feasible for either the courts or the executive department to try to apply.

■■■■ In disposing of this appeal, however, we need not—and do not—proceed solely by reference to the precise grounds pressed upon us by the parties. Our point of departure is that this is an action brought under the Declaratory Judgment Act. As we have said on another occasion, in accord with numerous declarations by this court [6] as well as the

---

4. Reliance was placed upon (1) the language of 2 U.S.C. § 2a which requires the President to transmit to Congress an apportionment statement showing "the *whole* number of persons in each State, excluding Indians not taxed * * *" (emphasis added); (2) the failure to effect amendments to the Census and Reapportionment Act which would have required the compilation of statistics to enforce Section 2; and (3) various legislative and judicial statements that Section

2 has never yet been implemented by Congress.

5. Cases allowing taxpayers to challenge the apportionment of taxes among the states are also cited to support appellants' contention that voters have standing to challenge the apportionment of representatives.

6. Davis v. Board of Parole, 113 U.S.App. D.C. 194, 306 F.2d 801 (1962) (discretion to decline jurisdiction when another jurisdiction is more appropriate); Gor-

Supreme Court,[7] "The courts have a broad measure of discretion to decline to issue declaratory judgments * *." Marcello v. Kennedy, 114 U.S.App.D.C. 147, 312 F.2d 874 (1962), cert. denied, 373 U.S. 933, 83 S.Ct. 1536, 10 L.Ed.2d 692 (1963). The language of the Act is permissive: "[A]ny court of the United States * * * *may* declare the rights and other legal relations of any interested party seeking such declaration * * *" (emphasis added). These provisions have been regarded as "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Public Service Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952). Thus it is appropriate, in the context of a declaratory judgment suit, to weigh a wider range of considerations than would be either necessary or appropriate if the only issue were one of standing.[8]

This discretion is not unbounded, and the admonition in Wesberry v. Sanders that dismissal for want of equity cannot mask what is in effect an improper dismissal for "political question" reasons must be observed. 376 U.S. 1, 4, 7, 84 S.Ct. 526 (1964). But some circumstances have been recognized as appropriate for declining to exercise jurisdiction under the Declaratory Judgment Act, and the factors there relevant are present here as well. In matters of public law, courts should be careful to avoid "futile or premature interventions" that would reach far beyond the particular case; and "[t]he disagreement must not be nebulous or contingent but must have taken on fixed and final shape * * *." Public Service Comm'n of Utah v. Wycoff Co., *supra* at 244-245, 73 S.Ct. at 240.[9] When the possibility of the injury's occurring is remote and uncertain, a declaratory judgment is inappropriate. See Eccles v. Peoples Bank, *supra* 333 U.S. at 431,[10] 68 S.Ct. at 644,

don v. Matthews, 106 U.S.App.D.C. 400, 273 F.2d 525 (1959) (similar); Heyward v. Public Housing Administration, 94 U.S.App.D.C. 5, 214 F.2d 222 (1954) (discretion to decline jurisdiction when a party, although not an indispensable party, was not before the court); Williams v. Virginia Military Institute, 91 U.S. App.D.C. 206, 198 F.2d 980 (1952), cert. denied, 345 U.S. 904, 73 S.Ct. 640, 97 L.Ed. 1341 (1953) (discretion to decline jurisdiction when jurisdiction is doubtful and another forum exists where jurisdiction is proper and which is better suited to decide the question); Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235 (1941), aff'd, 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694 (1942) (discretion to decline jurisdiction when the statutory scheme provides special review procedures).

7. Zemel v. Rusk, 381 U.S. 1, 19, 85 S.Ct. 1271, 1282, 14 L.Ed.2d 179 (1965); Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961); Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Brillhart v. Excess Ins. Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L. Ed. 1620 (1942); Aetna Life Ins. Co. of

Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L. R. 1000 (1937).

8. See Public Service Comm'n of Utah v. Wycoff Co., *supra*; Eccles v. Peoples Bank of Lakewood, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

9. In *Public Service Comm'n* the Supreme Court reversed a determination that respondent's carriage of motion picture films between points in Utah constituted interstate commerce. That conclusion was sought by respondent in order to prevent the Public Service Commission of Utah from regulating its activities. As viewed by the Court, the record did not reveal any attempt by the Commission "to enter any specific order or take any concrete regulatory step;" rather, it viewed respondent as seeking a declaratory judgment "*to guard against the possibility* that said Commission would attempt to prevent respondent from operating under its certificate from the Interstate Commerce Commission." 344 U.S. at 244, 73 S.Ct. at 241 (emphasis in original). Thus, a proper exercise of discretion required dismissing the case, because the possibility and the nature of any adverse action against respondent was too uncertain.

10. *Eccles* was an action for a declaratory judgment that a condition imposed upon

where it is said that "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative."

So it is that we must be concerned with the timing of the present action. The problem is not so much one of whether, as in some of the cases discussed hereinabove, an injury not yet incurred is likely ever to happen. We are under no illusions as to what has been going on in the states of residence of the Group II appellants. The remote and speculative character of the relief sought here derives, rather, from the fact that it cannot, by its very nature, become effective before several years have elapsed. Meanwhile, and largely since this suit was first filed, Congress has moved directly and in a massive way to eliminate the injuries which this complaint seeks to get at indirectly by means of the 1970 census and the apportionment made on the basis of it for the election of 1972. It is these events which create a remoteness of their own, and bring into play in this suit considerations of judicial economy and reluctance to prescribe for, or to correct, a coordinate branch of the national government in the discharge of its constitutional responsibilities as it understands them.

The Group I appellants claim to be injured because the value of their votes in allegedly non-discriminating states is diluted by the discrimination of other states against Negro voting. The continuation of this discrimination is an es-

sential predicate to the relief they request. If these practices cease, there is no dilution of their votes and, consequently, no injury needing redress. Whether the Group I appellants suffer any injury depends upon whether the allegations made by the Group II appellants concerning the denials and abridgements of the right to vote by their states can be sustained.[11]

The Group II appellants claim to be injured because of certain state-created obstacles to their exercise of the franchise. More specifically, the Virginia appellants complain that they are unable to vote because Virginia law requires the payment of a poll tax and the completion of a registration form in the registrant's handwriting. The Mississippi appellants advance a similar disability because of the constitutional interpretation test and poll tax required by their state. And the appellant from Louisiana asserts a like disability because of that state's requirement that voter registration forms must be completed without error of any kind.

The Voting Rights Act of 1965, however, was directed at eliminating voting discrimination for reasons of race or color through the use of literacy tests and similar devices. Under Section 4 of that Act, if the Attorney General of the United States determines that such devices were maintained by a state on November 1, 1964, and the Director of the Census determines that less than fifty per cent of the persons of voting age residing in that state were registered for or voted in the presidential elections of

respondent's membership in the Federal Reserve System was invalid. The condition provided that Transamerica, a bank holding company, could not own any of respondent's stock. The suit was instituted because the condition was violated by the acquisition of a small amount of stock by Transamerica. The Board of Governors of the Federal Reserve System expressed an intention not to invoke the condition, although it technically was violated, because the acquisition did not affect the control of respondent. Because of this assurance, respondent's grievances were regarded as "to remote and insubstantial, too speculative in nature," to be appropriate for judicial correction.

11. Appellants contend that the complaint may fairly be construed as alleging an interest of the Group I appellants which is independent of that asserted by the Group II appellants. But the allegations to which they refer, and the statistics offered in support of them, relate to the extent of the discrimination of which the Group II appellants complain with greater particularity. If, then, the specific practices complained of by the Group II appellants do not give rise to an injury which may be recognized at this time, the injuries alleged by the Group I appellants must also be viewed as prematurely asserted.

1964, then use of such devices is to be suspended. The requisite findings have been made by the Attorney General and the Director of the Census as to Virginia, Mississippi, and Louisiana; and the literacy tests of which appellants complain have been suspended.

The Twenty-fourth Amendment, which became effective in February of 1964, erases poll tax requirements for federal elections. Although it does not reach the imposition of poll taxes in state elections, Section 10 of the Voting Rights Act of 1965 recognizes that problem.[12] That Act includes a Congressional declaration "that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting." It authorizes the Attorney General to institute actions to set aside such taxes, and suits have been brought, pursuant to these provisions, to eliminate the poll tax requirements in the states in question. Appellants suggested that a substantial question exists as to the constitutionality of state poll taxes, but the Supreme Court has recently, in Harper v. Virginia State Board of Elections, 86 S.Ct. 1079 (March 22, 1966), removed that issue from the realm of speculation. In that case, the Court declared a Virginia poll tax of $1.50 repugnant to the equal protection clause, and spoke in words which leave no doubt as to the unconstitutionality of poll taxes as a prerequisite to voting.

Congress has, thus, acted vigorously and comprehensively to remove the obstacles to voting of which the appellants complain. To regard its measures as having no effect upon the discriminations alleged by the Group II appellants, and derivatively relied upon by the Group I appellants, would not afford them the respect an Act of Congress deserves. Congress has established a plan of direct action for assuring to all citizens a non-discriminatory right to vote, and steps have been taken to implement these provisions. At this time we cannot assay the final impact of these measures upon discrimination against Negro voting; nor do any of the allegations in the complaint assist in this task.[13] It has been thought the better part of judicial wisdom to withhold declaratory relief when "it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modifications so that its ultimate form cannot be confidently predicted." A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331, 82 S.Ct. 337, 342 (1961). In this case, in light of the specific steps taken by Congress to eliminate the Group II appellants' causes for complaint, our discretion is best exercised by declining to compel the District Court to open the door to judicial relief until it can fairly be said that discrimination persists despite these new measures.

That the relief appellants seek concerns preparation for a census which will not occur until 1970 reinforces our view that the march of events has made the complaint premature. Although litigation involves delay and time must be allowed to prepare for taking the census, some considerable latitude would still seem to exist for appraisal of the effectiveness of the new Voting Rights Act before appellants turn in desperation once more to the indirect sanction they believe to be imbedded in Section 2 of the Fourteenth Amendment.

Appellants argue that the Voting Rights Act is not certain to eliminate the injuries which are the basis for this suit. But we cannot speculate on that score.

12. On September 15, 1965, appellants moved for postponement of oral argument until the Supreme Court could decide the question of the rights of citizens to vote in state elections without payment of a poll tax. Although appellees consented to the motion, it was denied because of disagreement as to the effect of such decision on this case.

13. The complaint in this case was filed two years prior to the enactment of the Voting Rights Act of 1965. As appellants admit, "[A]t the time the complaint was drafted, proposal of the Act, much less its adoption, was unlikely."

Congress has selected the means it deems suitable. It should be presumed that these measures will receive the support that is commensurate with their high aims. If the Congressional means fall short of the Congressional ends, whether through lack of enforcement or stubborn resistance, that is a matter to be explored by the trier of fact at a later day.

In deciding to leave the District Court's dismissal of the complaint undisturbed, many of the contentions so vigorously made by the parties are not reached. We intend thereby neither to intimate any decision on the merits of this case, nor to disparage the seriousness of the questions presented. Issues affecting the right to vote touch upon "matters close to the core of our constitutional system." Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965). In telling appellants that events have made their complaint unsuitable for judicial disposition at this time, we think it also premature to conclude that Section 2 of the Fourteenth Amendment does not mean what it appears to say.

Affirmed.