**Victor SHARROW, Plaintiff-Appellant,**

v.

**George H. BROWN, Census Bureau Director, Department of Commerce, Washington, D. C. 20233, Defendant-Appellee.**

**No. 791, Docket 35840.**

United States Court of Appeals, Second Circuit.

Argued May 13, 1971.

Decided July 9, 1971.

—◆—

Victor Sharrow, pro se.

Joseph D. Danas, Yale L. Rosenberg, Asst. U. S. Attys., Whitney North Seymour, U. S. Atty., for appellee.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and ZAVATT, District Judge.*

WATERMAN, Circuit Judge:

Plaintiff Victor Sharrow, proceeding without counsel, has brought this action

* Of the Eastern District of New York, sitting by designation.

1. For an historical and political perspective on this section, see Zuckerman, A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment, 30 Fordham L.Rev. 93 (1961) (hereinafter referred to as Zuckerman). See also Oregon v. Mitchell, 91 S.Ct. 260, 280–303, 400 U.S. 112, 27 L. Ed.2d 272 (1970) (separate opinion of Harlan, J.).

2. § 141. Population, unemployment, and housing.

as part of his campaign to "enforce" Section 2 of the Fourteenth Amendment,[1] which reads:

Section 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial Officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

He seeks orders:

a) restraining, pending final determination upon the merits of his claims, the Director of the Bureau of the Census (hereinafter the Census Director) from executing his statutory duty under 13 U.S.C. § 141[2] to transmit (through the Secretary of Commerce) the results of the 1970 decennial census to the President of the United States on or before December 1, 1970;

b) convening a statutory three-judge district court to pass upon his application for a permanent injunction pro-

a) The Secretary [of Commerce] shall, in the year 1960 and every ten years thereafter, take a census of population, unemployment, and housing (including utilities and equipment) as of the first day of April, which shall be known as the census date.

b) The tabulation of total population by States as required for the apportionment of Representatives shall be completed within eight months of the census date and reported by the Secretary to the President of the United States.

hibiting the Census Director from carrying out the aforementioned statutory duties; and

c) convening a statutory three-judge district court to pass upon his claim that the statute[3] governing the manner of taking the census and of tabulating the total national population by States is unconstitutional for failure to comply with Section 2 of the Fourteenth Amendment.

It is appellant's contention that the second sentence of Section 2 of the Fourteenth Amendment (hereinafter designated for convenience, 14/2) requires the Census Bureau to compile statistics on the number of male adults in each State whose right to vote is denied or abridged, so that the House of Representatives may be properly apportioned according to the formula mandated by 14/2. As a basis for his standing to bring this suit, Sharrow alleges that New York State, of which he is a resident, has lost six representatives in Congress over the last three decades as a direct result of the Census Bureau's failure to compile the statistics he claims 14/2 mandates. The district court's opinion, dismissing Sharrow's complaint, is reported at 319 F.Supp. 1012.

Sharrow is not a newcomer to this court. During the 1960 census he refused to answer the questions propounded of him by the census taker. He refused to answer on the ground that the census was unconstitutional because questions to obtain information about the disenfranchisement of adult males for the purposes of 14/2 were not asked. He was subsequently indicted and convicted under 13 U.S.C. § 221(a) for his refusal to answer the questions that were included on the census form. At that trial and on the appeal from the conviction resulting therefrom, Sharrow defended his refusal on the ground that the taking of the 1960 census was unconstitutional for failure to comply with 14/2. We affirmed the conviction without reaching many of the questions posed by 14/2. We held that nothing in 14/2 required that Congress designate the census questionnaire as the means for determining whether adult males in a State are disenfranchised. United States v. Sharrow, 309 F.2d 77 (2 Cir. 1962), cert. denied, 372 U.S. 949, 83 S. Ct. 939, 9 L.Ed.2d 974 (1963).

In his previous appeal there was little doubt that, as a person convicted of violating the census statute, Sharrow had standing to attack the constitutionality of that statute. However, here he is a plaintiff, and we first must decide whether he has the requisite standing in the present litigation to challenge the operation of the 1970 census-taking machinery. To have such standing, he must show at least a substantial likelihood that the relief which he seeks will result in some benefit to himself. Massachusetts (Frothingham) v. Mellon, 262 U.S. 447, 486–487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Doremus v. Board of Education, 342 U.S. 429, 433, 72 S.Ct. 394, 96 L.Ed. 475 (1952); cf. Flast v. Cohen, 392 U.S. 81, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967). On this appeal Sharrow argues that the proper enforcement of 14/2 will result in an increase in the representation of New York State in the House of Representatives, and, therefore, that, derivatively, he, as a citizen of New York, will receive an augmented voice in congressional matters. We agree that an increased State delegation in Congress would benefit individual citizens of New York. Indeed, benefits are derived in two ways. First, with a larger delegation, each congressional district in the State will have fewer voters and the vote of each citizen will accordingly have more weight. See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Second, an increased State delegation, taken as a whole, would undoubtedly benefit citizens throughout New York in congressional attempts to obtain federal funds for projects in New York State.

3. Title 13 of the United States Code, and, specifically, 13 U.S.C. § 141(b).

However, the initial step in plaintiff's allegations as to standing presents difficulty. It could well be that, even if the House of Representatives were apportioned in the manner in which Sharrow construes 14/2, New York would not gain back any of its lost representatives. This point was discussed at length in Lampkin v. Connor, 239 F.Supp. 757, 760–763 (D.C.D.C.1965), aff'd, 123 U.S. App.D.C. 371, 360 F.2d 505 (1966), a case in which enforcement of 14/2 was also sought. In *Lampkin* the district court held that those plaintiffs who alleged that their States might be entitled to more representatives if 14/2 were enforced lacked standing because the potential results of a reapportionment under 14/2 were entirely speculative. We agree with the court in *Lampkin* insofar as that court implied that standing might be exceedingly hard to establish. For instance, to establish standing in the present case, Sharrow would have to show, at least approximately, the apportionment his interpretation of 14/2 would yield, not only for New York but for every other State as well. This would necessitate a state-by-state study of the disenfranchisement of adult males, a task of great proportions. And even after approximate nation-wide reapportionment figures were derived, it might well be that, because of population shifts, or because New York itself disenfranchised a portion of its adult males,[4] New York's representation would not be increased as Sharrow claims.

In *Lampkin* the plaintiffs had not undertaken the difficult task of approximating what the resulting nation-wide reapportionment would be, and, indeed, they admitted that, as far as their statistics showed, the result was speculative. Thus, the plaintiffs in *Lampkin* did not sustain their burden on the issue of standing. Therefore, the result in that case cannot be taken to foreclose the possibility that some later plaintiff, such as Sharrow, might undertake the Herculean task of compiling the necessary statistics to establish his standing.

In this case, however, Sharrow has introduced no evidence that New York's loss of six representatives over the past thirty years is the result of anything other than shifts in population.[5] Without such evidence, we cannot say that Sharrow has established his standing to seek the relief he requests. His sincere effort, an effort which we respect, to rectify what he considers a grave constitutional mistake is not enough. He must establish that the failure to enforce 14/2 has resulted in a detriment to his rights of representation in Congress and this he has failed to do.

But, even assuming that Sharrow had established his standing to bring this action, we must affirm the dismissal below. Sharrow has not sued the Secretary of Commerce,[6] nor the President,[7] nor the

---

4. See, e. g., § 152(6) of New York's Election Law, McKinney's Consol.Laws, c. 17, which denies the right to vote to those persons adjudged incompetent or committed to an institution for the mentally ill. See *Zuckerman, supra* note 1, at 108, 118, for conflicting views as to whether the denial of the vote because of mental illness is an abridgment within 14/2. In addition, New York's Election Law § 150 sets certain residency requirements for voter registration. Whether such requirements fall within 14/2 is also uncertain. See *Zuckerman* at 108, 118. As *Zuckerman* points out, even a slight reduction of a State's population basis may result in a loss of representatives. *Zuckerman* at 112–113 and n. 104.

5. See 319 F.Supp. 1012, 1014, n. 3.

6. In Lampkin v. Connor, *supra*, plaintiffs sued both the Secretary of Commerce and the Census Director, apparently relying on the wording of 13 U.S.C. § 141 (quoted *supra* note 2) which requires the Secretary to transmit the population figures to the President. In light of our holding in Sharrow's prior appeal, it could well be that the Secretary of Commerce is also under no constitutional mandate to compile statistics to enforce 14/2.

7. Under 2 U.S.C. § 2a(a) the President transmits to Congress after each decennial census a statement showing the number of Representatives allotted to each State.

Clerk of the House of Representatives.[8] He has sued the Census Director on the grounds that it is the duty of the Census Bureau to gather the statistics necessary to enforce 14/2. Although the Census Bureau may be the most efficient instrument for gathering these statistics, we squarely held in Sharrow's prior appeal, 309 F.2d 77 (2 Cir. 1962), that nothing in the Constitution mandates that the Census Bureau be the agency to gather these statistics. Instead of directly attacking the 1970 apportionment, Sharrow has raised the identical issue of governmental unconstitutional action he presented on his prior appeal, and the district court acted quite properly in dismissing Sharrow's complaint.

Because of our disposition of the present appeal, we do not reach many of the difficult problems of constitutional interpretation raised by 14/2 not argued by Sharrow.[9]

The dismissal below is affirmed.

---

8. Under 2 U.S.C. § 2a(b) the Clerk of the House of Representatives, after receiving the statement referred to in note 7 *supra,* sends to the executive of each State "a Certificate of the number of Representatives to which such State is entitled under this Section."

9. For example, does 14/2 direct Congress, or merely empower it, to reduce the representation of a State which disenfranchises a portion of its male population "being twenty-one years of age"? Appellee relies on Section 5 of the same Fourteenth Amendment to support his contention that Section 2 does no more than empower Congress to pass legislation reducing the representation of certain States if it so desires. Two earlier appellate court decisions have implied that any enforcement of Section 2 is solely within the discretion of Congress and thus presents a nonjusticiable political question. Lampkin v. Connor, 123 U.S. App.D.C. 371, 360 F.2d 505, 509–512 (1966); Saunders v. Wilkins, 152 F. 2d 235, 238 (4 Cir. 1945), cert. denied, 328 U.S. 870, 66 S.Ct. 1362, 90 L. Ed. 1640 (1946). However, apportionment practice would seem to indicate that at least the first sentence of Section 2 has been considered mandatory.

Also, the wording and context of Section 2 would seem to indicate that any loss of representation by a State would last until the next decennial census and that these lost Representatives would be apportioned among the other States for a full decade. However, the issue is not free from doubt. See *Zuckerman, supra* note 1, at 115, 120–121, discussing two unsuccessful bills in Congress which interpreted the method of reduction differently.

Nor have the parties addressed the problem of what effect the Nineteenth Amendment may have on the operation of 14/2. As *Zuckerman, supra* note 1, at 122–123, points out, no State permitted females to vote at general elections during the period in which the Fourteenth Amendment was passed and ratified. Thus, it is quite natural for Section 2 to limit its reduction formula to the disenfranchisement of adult males. However, it may be that the ratification of the Nineteenth Amendment requires the term "males" in Section 2 to be read as "males and females."

Furthermore, it is not altogether clear how broadly the terms "abridged" and "denied" are to be interpreted. Various facets of this question include the definition of State action, the treatment of the mentally ill, State voter registration, State residency requirements, and action by private citizens. See *Zuckerman, supra* note 1, at 103–104, 118, 120, 126–127.

We leave these questions, along with many others, to another day.