ABORTION RIGHTS MOBILIZATION, INC., Lawrence Lader, Harold W. Bostrom, Margaret O. Strahl, M.D., Helen W. Edey, M.D., Ruth P. Smith, National Women's Health Network, Inc., Long Island National Organization for Women—Nassau, Inc., Rabbi Israel Margolies, Reverend Bea Blair, Rabbi Balfour Brickner, Reverend Robert Hare, Reverend Marvin G. Lutz, Laurel Clinic, Inc., Milan M. Vuitch, M.D., Women's Center for Reproductive Health, The Federation of Feminist Women's Health Centers, Inc., Harrisburg Reproductive Health Services, Inc., Hagerstown Reproductive Health Services, Inc., Women's Health Services, Inc., Jane C. Delgado, Jennie Rose Lifrieri, Eileen Walsh, Patricia Sullivan Luciano, Marcella Michalski, Chris Niebrzydowski, Judith A. Seibel, Karen DeCrow, and Susan Sherer, Plaintiffs,

v.

Donald T. REGAN, Secretary of the Treasury, Roscoe L. Egger, Jr., Commissioner of Internal Revenue, United States Catholic Conference, Incorporated, and National Conference of Catholic Bishops, Defendants.

No. 80 Civ. 5990 (RLC).

United States District Court,
S. D. N. Y.

July 19, 1982.

Karpatkin, Pollet, Perlmutter & Beil, Marshall Beil, Carol A. Schrager, New York City, Stephen B. Latham, Joyce E. Roop, Brookline, Mass., Sybil Shainwald, New York City, for plaintiffs; Constance E. Cook, Ithaca, N. Y., of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants Sec. of the Treasury and Comm. IRS; William J. Brennan, Asst. U. S. Atty., New York City, of counsel.

Simpson, Thacher & Bartlett, Roy L. Reardon, Conrad K. Harper, Cynthia G. Beerbower, James Kalb, Richard L. Mattiaccio, David J. Reich, Richard P. Roelofs,

Mark G. Cunha, Robert E. Spatt, New York City, for defendants United States Catholic Conference and National Conference of Catholic Bishops; Wilfred R. Caron, Gen. Counsel, U. S. Catholic Conference and National Conference of Catholic Bishops, Washington, D. C., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This is an action challenging the constitutionality of the government's enforcement of § 501(c)(3) of the Internal Revenue Code ("Code"), 26 U.S.C. § 501(c)(3) (1976). Plaintiffs are 29 individuals and organizations concerned about the right of a woman to choose to carry a fetus to term or to abort it and about the constitutionally mandated separation of church and state. The complaint names four defendants: two government officers ("government" or "federal defendants"), Donald T. Regan, the Secretary of the Treasury, and Roscoe L. Egger, Jr., the Commissioner of Internal Revenue, and the two principal national organizations of the Roman Catholic Church in the United States ("church defendants"), the United States Catholic Conference, Incorporated ("USCC"), and the National Conference of Catholic Bishops ("NCCB").

Defendants move to dismiss the action. They assert that none of the plaintiffs has the requisite standing to bring the suit, that the complaint does not state a claim upon which to grant relief, and that the court may not review the particular decisions to enforce or not to enforce § 501(c)(3) that are in dispute. In addition, the church defendants contend that they are not proper parties to this suit and that § 501(c)(3) is unconstitutional. For the reasons discussed herein, the motions to dismiss are granted in part and denied in part.

I

### A. *The Plaintiffs*

The complaint names nine organizations and twenty individuals as plaintiffs. Each

plaintiff (except Judith Seibel) has submitted an affidavit to augment the complaint's description of that plaintiff's particular concerns and injuries. The plaintiffs are described briefly here; their particular grievances are discussed in greater detail *infra.*

Abortion Rights Mobilization, Inc. ("ARM") is a non-profit, tax-exempt organization under § 501(c)(3) that seeks to secure and implement a woman's right to a legal abortion. It is a national organization and is prohibited from engaging in political activity under the terms of its tax exemption. Contributions to ARM are tax-deductible.

Lawrence Lader is a writer, and founder and president of ARM. He has been active in the abortion rights movement and has written a number of books on the subject.

Harold W. Bostrom, Margaret O. Strahl, M.D., Helen W. Edey, M.D., and Ruth P. Smith all contribute to ARM, other abortion rights organizations and pro-choice political candidates.

National Women's Health Network, Inc. ("NWHN") is a tax-exempt membership organization of many clinics, counseling services, publishers and others who provide a wide range of services to women and attempt to influence the public to support women's rights, including the right to have an abortion. Contributions to NWHN are tax-deductible, but the organization is prohibited under § 501(c)(3) from engaging in electoral politics.

Long Island National Organization For Women ("Nassau-NOW") is a membership organization dedicated to the promotion of women's rights, including the right to have an abortion. Nassau-NOW is exempt from taxes under § 501(c)(4) of the Internal Revenue Code.

Rabbi Israel Margolies, Reverend Beatrice Blair, Rabbi Balfour Brickner, Reverend Robert Hare and Reverend Marvin G. Lutz ("clergy plaintiffs") are members of the clergy whose religious beliefs differ significantly from the Catholic Church's view of abortions. These clergy members have been active in the abortion rights movement but have not used the power of their pulpits to engage in political activities.

Laurel Clinic, Inc., Women's Center for Reproductive Health, The Federation of Feminist Women's Health Centers, Inc., Harrisburg Reproductive Health Services, Inc., Hagerstown Reproductive Health Services, Inc. and Women's Health Services, Inc. are clinics that offer to women a range of medical and other services, including abortions. The Federation of Feminist Women's Health Centers, Inc., Women's Health Services Inc. and the Women's Center for Reproductive Health are exempt from taxes under § 501(c)(3).

Milan M. Vuitch, M.D., is president of the Laurel Clinic, Inc.

Jane C. Delgado, Jennie Ross Lifrieri, Eileen Walsh, Patricia Sullivan Luciano, Marcella Michalski, Chris Niebrzydowski and Judith A. Seibel are Roman Catholics who, in keeping with their religious beliefs, contribute or have contributed to the church but who nonetheless are opposed to the church's position on abortion.

Karen DeCrow is a leader of the feminist movement and a former national president of the National Organization for Women. She was a candidate for political office in 1969 and is a potential candidate in the future.

Susan Sherer is active in the abortion rights movement.

All the individual plaintiffs are taxpayers and voters. Each of them in his or her affidavit expresses a substantial concern for the separation of church and state that is required by the establishment clause of the first amendment. Finally, plaintiff Brickner, as a private citizen, is chairman of the national issues committee of the New York State Liberal Party.

B. *The Statutory Scheme*

Section 501(c)(3) of the Code exempts from taxation groups "organized and operated exclusively for religious, charitable, . . . or educational purposes, . . . no substantial part of the activities of which is

carrying on propaganda, or otherwise attempting, to influence legislation ..., and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." 26 U.S.C. § 501(c)(3) (1976). Organizations exempt from income taxation under this section in effect receive a double benefit because § 170(a), (c)(2)(B) of the Code permits an income, gift or estate tax deduction for contributions to most § 501(c)(3) entities. *See* 26 U.S.C. § 170 (1976). Section 501(c)(3) status, thus, is valuable to an organization because the organization can provide donors with an economic incentive to contribute to it and the organization is not taxed on the income received. Organizations exempt from taxation under other portions of § 501, by contrast, often are not entitled to receive tax-deductible contributions. *See* 26 U.S.C. §§ 170, 501 (1976).

To maintain the dual benefit of tax exemption and deductible contributions, a § 501(c)(3) entity must refrain from any kind of campaigning for candidates for public office. 26 U.S.C. § 170(a), (c)(2)(D) (1976); *id.* § 501(c)(3). These groups, however, are allowed to lobby as long as their attempts to influence legislation do not constitute a "substantial part" of their activities. 26 U.S.C. § 501(c)(3) (1976).

## C. *The Dispute*

The Internal Revenue Service ("IRS"), annually since March 25, 1946, has ruled that "the agencies and instrumentalities and all educational, charitable and religious institutions operated, supervised, or controlled by or in connection with the Roman Catholic Church in the United States, its territories or possessions appearing in the Official Catholic Directory ... are entitled to exemption from Federal income tax under ... section 501(c)(3)...." Exh. A to church defendants' Motion to Dismiss (Letter from T. Kern, District Director, IRS to USCC, June 16, 1980). Defendant USCC is the recipient of the Revenue Ruling letter that certifies the church's exempt status.

Plaintiffs contend that this grant of § 501(c)(3) privileges was erroneously and illegally conferred because the church defendants are engaged in a nationwide plan to change abortion laws by, *inter alia*, lobbying and participating in partisan political campaigns on behalf of candidates supporting the Roman Catholic Church's position on abortion and in opposition to candidates with contrary views. Amended Complaint ¶¶ 21–28; *cf. McRae v. Califano*, 491 F.Supp. 630, 703–28 (E.D.N.Y.), *rev'd on other grounds sub nom. Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (describing some of the church's electoral and legislative activities pursuant to its "Pastoral Plan" to outlaw abortion). Despite this violation of the Code, plaintiffs allege, the government defendants have declined to apply the § 501(c)(3) prohibition against electioneering or lobbying to the church defendants and their subsidiaries. By contrast, no organization with different views on the abortion controversy has been granted tax-exempt status under § 501(c)(3) while being permitted to participate in electoral politics.

Plaintiffs contend that this illegal activity has injured them in several ways. The individual plaintiffs and the members of certain of the institutional plaintiffs have been denied access to a means of contributing tax-deductible funds to promote free choice candidates. Persons with opposing views about abortion, on the other hand, can use the church to funnel donations to support candidates opposed to abortion and thereby receive a tax benefit. Those plaintiffs who have stood for office or aspire to do so on a pro-choice platform have no means of collecting tax-deductible and exempt funds for their campaign chests. Their opponents may do so. The government defendants, it is alleged, have diminished the effectiveness of plaintiffs' political speech and their chances to prevail at the polls by enhancing the voice of plaintiffs' political adversaries.

Plaintiffs also express concern about the entanglement of church and state through the selective grant of an unrestricted tax exemption to the church defendants. The

government defendants' actions are viewed by plaintiffs as selecting a favored state orthodoxy, thereby breaching the wall between church and state and denigrating religious beliefs out of government favor. In addition, plaintiffs who are religiously compelled to consider abortion as the correct response to pregnancy or who, as ministers, must counsel their congregants to do the same, express the fear that government financial support, through the Code, of the Roman Catholic Church's position on abortion will imperil the opportunity of women to obtain abortions and thereby frustrate their ability to observe their religious beliefs. Plaintiffs who are members of and contributors to the Roman Catholic Church object to their church's political use of the religiously compelled contributions.

The organizational plaintiffs complain that the government defendants have treated them differently from the church for no rational reason. In addition, those plaintiffs offering medical services to women, including abortion, assert that as a result of the church defendants' government subsidized political campaigning, restrictive abortion legislation has been enacted that has caused a decrease in plaintiffs' revenues.

Plaintiffs seek a declaration from the court that the political activities of the Roman Catholic Church and the inaction by the Secretary and the Commissioner violate the Constitution and the Code. In addition, plaintiffs request an order requiring the government defendants to take all actions necessary to enforce the Constitution and the Code, including revocation of the church defendants' § 501(c)(3) status, collection of all taxes due, and notification to church contributors that they may not deduct such contributions.

Jurisdiction is founded on 28 U.S.C. §§ 1331, 1340, 1361.

## II

Defendants challenge plaintiffs' standing to bring an action concerning the tax status of third parties. Plaintiffs respond by asserting three bases for their right to proceed: establishment clause standing, voter standing, and equal protection standing.[1]

### A. *Article III Requirements*

■ The Supreme Court recently has had occasion to examine and clarify the rules for standing in federal courts.

"The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72 [98 S.Ct. 2620, 2629, 57 L.Ed.2d 595] (1978), quoting *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). This requirement of a "personal stake" must consist of "a 'distinct and palpable injury ...' to the plaintiff," *Duke Power Co.*, 438 U.S. at 72 [98 S.Ct. at 2629], quoting *Warth v. Seldin*, 422 U.S. 490, 501 [95 S.Ct. 2197, 2206, 45 L.Ed.2d 343] (1975), and "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," *Duke Power Co.*, 438 U.S. at 72, [98 S.Ct. at 2629], quoting *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S.

---

1. Plaintiffs have withdrawn a fourth theory of standing based upon their status as taxpayers. Taxpayer standing is a narrow grant to challenge Congressional action under the taxing and spending power of Art. I, § 8 of the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, —— U.S. ——, ——, 102 S.Ct. 752, 762–63, 70 L.Ed.2d 700 (1982) [hereinafter cited as *Valley Forge*]; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 228,

94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 174–75, 94 S.Ct. 2940, 2945–2946, 41 L.Ed.2d 678 (1974).

For purposes of ruling on the standing question, the court must accept as true all material allegations in the complaint, construe the complaint in favor of the plaintiffs and similarly consider supporting affidavits. *E.g. Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

252, 261 [97 S.Ct. 555, 561, 50 L.Ed.2d 450] (1977).

*Larson v. Valente,* —— U.S. ——, ——, 102 S.Ct. 1673, 1680, 72 L.Ed.2d 33 (1982). In addition to demonstrating an injury that the challenged action caused, plaintiffs must show "that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 74, 98 S.Ct. at 2630; *accord, Larson v. Valente, supra,* 102 S.Ct. at 1682 n. 15; *Simon v. E. Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The Court's statements indicate that a three step inquiry should be observed in determining Article III standing: injury in fact must be ascertained, a causal link between the injury and the putatively illegal conduct must be identified, and the court must be able to provide a remedy.[2]

█ 1. *Establishment Clause Standing.* The existence of Article III injury "often turns on the nature and source of the claim asserted." *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. at 2205. The injury in fact requirement can be satisfied by a wide range of harms, including economic, aesthetic, environmental, or spiritual damage. *See, e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 111–12, 99 S.Ct. 1601, 1613–1614, 60 L.Ed.2d 66 (1979) (denial of right to interracial association); *Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 73–74, 98 S.Ct. at 2629–2630 (environmental and aesthetic consequences of pollution); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973) (enjoyment of natural resources); *School Dist. of Abington Township, Pa. v. Schempp,* 374 U.S. 203, 208–210, 212, 83 S.Ct. 1560, 1563–1564, 1565, 10 L.Ed.2d 844 (1963) (spiritual values). There is no invariant meaning to the term "palpable injury"; the Constitution or a statute can create an interest that exists only in the legal regime, and damage to such an interest may fulfill the injury in fact requirement. *See Valley Forge, supra,* 102 S.Ct. at 769 (1982) (Brennan, J., dissenting); *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 152, 71 S.Ct. 624, 638, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

Although the Supreme Court has recognized that violation of a person's "spiritual stake in the First Amendment values" of separation of church and state may inflict sufficient harm to satisfy the injury in fact test, *see Data Processing Service Organizations v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), *citing School Dist. of Abington Township, Pa. v. Schempp, supra,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, it has cautioned that offense to one's sense of fidelity to separatist principles is an insufficient injury to bring suit for an alleged establishment clause violation. *See Valley Forge, supra,* 102 S.Ct. at 764–66; *Doremus v. Bd. of Education,* 342 U.S. 429, 431, 433–34, 72 S.Ct. 394, 396, 396–97, 96 L.Ed. 475 (1952). Would-be plaintiffs must show that they are "directly affected by the laws and practices against which their complaints are directed." *School Dist. of Abington Township, Pa. v. Schempp, supra,* 374 U.S. at 224 n.9, 83 S.Ct. at 1572 n.9.

In *Valley Forge,* the Supreme Court overturned a decision granting standing to an organization suing on behalf of its members who professed injury to their shared individuated right to non-establishment when surplus federal property was transferred to a denominational college.[3] *See* 102 S.Ct. at 764–66. Crucial to the Supreme Court's decision was the complete lack of connection between the plaintiff and the property.

**2.** Although some opinions have described the test as a two pronged one, the second "prong" seemingly contains two discrete, albeit closely related, elements: causation and redressability. For purposes of clarity, the test therefore shall be considered to analyze three separate factors.

**3.** Although the *Valley Forge* plaintiffs asserted principally a claim of taxpayer standing, the Supreme Court opinion discussed at length the standards for establishment clause standing. *See* 102 S.Ct. at 763–67. This discussion was in direct response to the basis for finding standing that the Court of Appeals had articulated. *See id.* at 763–64.

Neither plaintiff nor its members alleged any physical contact with the college or its environs, and plaintiff and its members did not claim that they may have been entitled to the property if it had not been given to the college. Although the transfer affronted plaintiff's members' sense of the command of the establishment clause, they could not identify any more definite and personalized connection with the objectionable transaction. *See id.* at 766. In the absence of some interest in the property, plaintiff or its members suffered no injury from the transfer.

Similarly in *Doremus v. Bd. of Education,* the Court dismissed for lack of standing the complaint of taxpayers contending that a New Jersey statute requiring Bible reading at the opening of the school day violated the establishment clause. *See* 342 U.S. at 430, 72 S.Ct. at 395. Plaintiffs did not allege any personal, religiously inspired interest or activity that the Bible reading interfered with nor did they have any personal contact with the recitations, either through attendance or through children in attendance. *See id.* at 431, 72 S.Ct. at 396.

Underlying the rejection of plaintiffs' standing in *Valley Forge* and *Doremus* is the principle that the interest of each citizen that the government be administered according to law does not confer standing because it does not create in that citizen a discrete and palpable injury. *Valley Forge, supra,* 102 S.Ct. at 764; *see Schlesinger v. Reservists Comm. to Stop the War, supra,* 418 U.S. at 216–22, 94 S.Ct. at 2929–2932 (1974). Plaintiffs asserting establishment claims, as any other plaintiffs, have "no special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." *Valley Forge, supra,* 102 S.Ct. at 766 (footnote omitted).[4]

The individual plaintiffs' concern about the establishment clause violations perpetrated by the defendants does not rise above the whistleblowing that the Supreme Court held, in *Valley Forge,* does not satisfy the injury requirement. Plaintiffs attempt to articulate injury in fact by linking the offending activity with their involvement in the abortion rights controversy. They describe the government action of which they complain as a subsidy to opponents of abortion that impacts on plaintiffs' particularized interest to preserve reproductive choice. Plaintiffs argue, in effect, that because they object to an establishment violation occurring in a particular arena of public controversy in which they are involved, they have suffered a discrete and palpable injury not experienced by the *Valley Forge* plaintiff. Plaintiffs' characterization of their injury shares the defect that caused the demise of the *Valley Forge* complaint. In both cases, plaintiffs described an interest that brought them to court, but they did not articulate an injury that they had suffered. Plaintiffs' devotion to the pro-choice position does not identify an interest that the allegedly illegal activities have damaged; it only explains why plaintiffs have chosen to complain about a particular government impropriety—renewal of the church defendants' § 501(c)(3) status—and not about some other wrongdoing. Plaintiffs' "special interest" in reproductive freedom is no different than the *Valley Forge* plaintiff's "special interest" in strict separation. The narrowness of the focus of litigant's concerns is not of constitutional significance as

---

**4.** The crucial standing defect in the claim of a citizen alleging governmental misconduct and nothing more is not that the alleged misconduct does not inflict harm on someone, but that the wrongdoing does not injure the plaintiff personally. Such allegations may be sufficient to make out a claim that someone has been injured; they fail to confer standing because they do not satisfy the Article III requirement that the plaintiff be among those who have suffered the injury. *See Warth v. Seldin, supra,* 422 U.S. at 502, 95 S.Ct. at 2207; *Fed'n for Am. Immigration Reform v. Klutznick,* 486 F.Supp. 564, 568 & n.7 (D.D.C.) (three judge court), *appeal dismissed,* 447 U.S. 916, 100 S.Ct. 3005, 65 L.Ed.2d 1109 (1980).

This standing defect should not be confused with the prudential reason for declining to hear a case that presents a generalized grievance that is better resolved by the executive or the legislature even though the plaintiff has suffered an injury in fact and has satisfied the other Article III standing requirements. *See* p. 484 *infra.*

far as standing is concerned. There is no indication in the *Valley Forge* opinion that the plaintiff there would have met the injury in fact test if it single-mindedly pursued its anti-establishment goals in the field of public education only, rather than its objections to government support for any religious body or activity. *See id.* 102 S.Ct. at 765 ("standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.").[5]

The organizational plaintiffs also fail to set out the injury in fact to themselves or their members that is necessary to confer standing under the establishment clause. They merely allege concern about the first amendment violations arising from the church's political activity while it enjoys § 501(c)(3) status. As did the individual plaintiffs, the organizations have explained why they are moved to bring suit to end these violations; they have not, however, explained how the violations injure them.[6]

The clergy plaintiffs and the Women's Center for Reproductive Health ("Women's Center") have disclosed, in their affidavits, compelling and personalized injuries flowing from the tacit government endorsement of the Roman Catholic Church position on abortion that are sufficient to confer standing on them to complain of the alleged establishment clause violations. The clergy plaintiffs have devoted their lives to religious communities and beliefs that are denigrated by government favoritism to a different theology. They provide spiritual leadership to and care for the spiritual needs of their congregations. As part of these duties, they must counsel those in their care in accordance with religious laws that command consideration of abortion as the morally required response to pregnancy.[7] The Women's Center provides guidance to women in decisionmaking on issues pertaining to family life, including child-

---

5. Several Roman Catholic laity assert claims of injury that could be distinguishable from the claims of the public generally. These plaintiffs object to the federal defendants' standing aside while the church violates § 501(c)(3) by using funds contributed to it, including donations from the plaintiffs, to electioneer for anti-abortion candidates. Such claims might be construed to plead injury to the plaintiffs' church from non-enforcement of the Code. The establishment clause was designed not only to protect civil society from undue pressures from spiritual communities within it, but also to protect the sacred life of the population from the taint of secular politics. *See Everson v. Bd. of Educ. of Ewing Tp.*, 330 U.S. 1, 39–40, 53–54, 67 S.Ct. 504, 522–523, 529–530, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting); Memorial and Remonstrance Against Religious Assessments ¶¶ 6–8, *reprinted in id.* at 67–68, 67 S.Ct. at 536–537.

In their affidavits, however, these plaintiffs do not express concern for the pollution of their church by its forbidden entrance into the area of politics. Their expressed claims are limited to injuries to their "rights to live in a society that believes in freedom of religion." *E.g.* Delgado affidavit ¶ 5; Walsh affidavit ¶ 5. This is a generalized harm experienced as a citizen, not as a church member, and is a harm that is indistinguishable from the injury inflicted upon all citizens by executive disregard for the law. Because these plaintiffs have not complained of a distinct and palpable injury inflicted upon them as practicing Roman Catholics, they have no standing under the establishment clause.

6. The groups providing medical services to women arguably occupy a different position from the other institutional plaintiffs because they allege threatened or actual economic loss from the defendants' illegal activities. This injury, however, will not confer standing because the causal link between the church's tax status and these plaintiffs' lost revenues is tenuous at best. It is doubtful that the marginal increase in the coffers of the foes of abortion that is attributable to the church's tax exemption is a significant factor in legislation that has reduced the income of abortion clinics.

7. The clergy plaintiffs have identified in their affidavits their respective denominations' attitudes towards pregnancy and abortion. These affidavits state that certain theologies consider compelling a woman to carry a fetus to term as repugnant as other theologies, such as the contemporary Roman Catholic Church doctrine, find abortion, *see* Affidavit of Rabbi Israel Margolies ¶ 3 ("To force a woman to bring an unwanted fetus into the world is a serious abridgement of the Bible ..."), and that the availability of safe abortions may be necessary to permit a woman to fulfill her religious obligations, *see* Affidavit of Rev. Beatrice Blair ¶¶ 5–6 ("part of Episcopalian doctrine that women and families should be free to terminate [certain] pregnancies."); *cf. McRae v. Califano, supra,* 491 F.Supp. at 696–702 (discussing prochoice theological doctrines).

bearing. It was founded by Reverend Lutz along with others to put the principles of the Presbyterian Church into effect. As with the clergy plaintiffs, the Women's Center's religiously inspired mission is denigrated by government endorsement of a theology contrary to its guiding principles.

Tacit government endorsement of the Roman Catholic Church view of abortion hampers and frustrates these plaintiffs' ministries. The government need not silence these plaintiffs to cause discrete spiritual injury because official approval of an orthodoxy antithetical to their spiritual mission diminishes their position in the community, encumbers their calling in life, and obstructs their ability to communicate effectively their religious message. The spiritual values protected by the establishment clause can be injured without direct coercion against individuals, see *Engel v. Vitale*, 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–1267, 8 L.Ed.2d 601 (1962) (indirect coercive pressure to conform to officially approved doctrine), even if plaintiffs have not alleged that particular religious freedoms have been infringed, *School Dist. of Abington Township, Pa. v. Schempp, supra,* 374 U.S. at 224 n.9, 83 S.Ct. at 1572 n.9 (1963). It is sufficient to establish injury in fact that plaintiffs can show, as the clergy plaintiffs have, that the challenged action adversely affects them in their daily lives. *See id.*

These plaintiffs also clearly satisfy the second and third aspects of the Article III standing test—causation and redressability.

Their injury flows directly from the federal defendants' allowing the church defendants the privilege of retaining § 501(c)(3) status while electioneering and denying this privilege to other religious organizations. The granting of a uniquely favored tax status to one religious entity is an unequivocal statement of preference that gilds the image of that religion and tarnishes all others. A decree ordering the termination of this illegal practice and restoring all sects to equal footing will redress this injury. Accordingly, the clergy plaintiffs and the Women's Center meet the Article III requirements for standing to raise claims under the establishment clause.

■ 2. *Voter standing.* In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court conferred "voter standing" on a group of Tennessee citizens challenging that state's apportionment scheme as "effecting a gross disproportion of representation to voting population." *Id.* at 207, 82 S.Ct. at 704. The plaintiffs asserted that the classification disfavored the voters in some counties by "placing them in a position of unjustifiable inequality *vis-a-vis*" voters in other counties. *Id.* These allegations stated sufficient injury to satisfy the Article III standing requirements.

*Baker*'s voter standing analysis was applied in three cases that strongly support a finding that the individual plaintiffs [8] and certain of the organizational plaintiffs [9]

---

**8.** Plaintiffs Lader, Bostrom, Strahl, Edey, Smith, Margolies, Blair, Brickner, Hare, Lutz, Vuitch, Delgado, Lifrieri, Walsh, Luciano, Michalski, Niebrzydowski, Seibel, DeCrow, and Sherer.

**9.** None of the organizational plaintiffs can allege injury to themselves as organizations in the context of voter standing. *See Simon v. E. Ky. Welfare Rights Organization, supra,* 426 U.S. at 39–40, 96 S.Ct. at 1924–1925 (1976); *Fed'n for Am. Immigration Reform v. Klutznick, supra,* 486 F.Supp. at 569. Organizations can establish standing, however, "as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right. *Warth v. Seldin, supra,* 422 U.S., at 511 [95 S.Ct., at 2211]." *Simon v. E. Ky. Welfare Rights Organization,*

*supra,* 426 U.S. at 40, 96 S.Ct. at 1925; *see Common Cause v. Democratic Nat'l Comm.,* 333 F.Supp. 803, 809 & n.11 (D.D.C.1971). National Women's Health Network, Inc., ARM and Nassau-NOW are devoted to promoting women's rights, including the right to a legal abortion. Given the political orientation of this organizational purpose, these entities have powerful claims to represent voter-members "uniquely, or even predominantly, injured" by the challenged government conduct. *Ripon Society v. Nat'l Republican Party,* 525 F.2d 567, 573 (D.C.Cir.1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). In any event, the organizational plaintiffs' standing will depend upon their members' satisfaction of the requirements of voter's standing, and the groups' participation in the case cannot "lessen

have asserted a distinct, personal injury that confers standing. Two of the cases, like the instant action, involved challenges to the enforcement of the tax laws. All three are highly instructive.

*Tax Analysts and Advocates v. Shultz*, 376 F.Supp. 889 (D.D.C.1974), involved a challenge to an IRS revenue ruling stating that gifts of up to $3,000 to multiple finance committees organized to receive campaign contributions for the same candidate were to be treated as gifts to the committee and not to the candidate. Plaintiffs, a nonprofit corporation promoting tax reform and one of its members, alleged that the revenue ruling was illegal because it permitted individuals to donate unlimited sums and to escape gift taxes by donating $3,000 increments to separate committees which served only to funnel the money to central committees for the particular candidate. *Id.* at 891. Focusing on the corporate plaintiff's membership in applying the standing tests, the court noted that the named member was "a taxpaying citizen, voter and small contributor to election campaigns." *Id.* at 898. As such, plaintiff asserted that the challenged ruling substantially diminished "his ability to affect the electoral process and to persuade elected officials to adopt policies and programs he favors" by increasing the influence of a favored class of large contributors. *Id.* Applying constitutional standing doctrine to these circumstances, the court held that alleged diminution of one's vote and dilution of the ability to affect the electoral process "are judicially recognized wrongs and are thus sufficient allegations of actual injury." *Id.* at 899.

Two Illinois voters, one a political candidate, the other a supporter, had standing to challenge the patronage system in Cook County because of the alleged injury to their interest "in an equal chance and an equal voice" in the election process. *Shakman v. Democratic Organization of Cook County*, 435 F.2d 267, 269–70 (7th Cir. 1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971). Since that interest is protected by the federal constitution, impairment thereof gives standing to the victims of the challenged practices. *Id.* at 269; *see Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315, 1328 (N.D. Ill.1979) (granting summary judgment to plaintiffs).

Finally, in *Common Cause v. Democratic National Comm.*, *supra*, a non-profit public interest corporation, its chairman (a voter) and two elected politicians sought declaratory and injunctive relief against several national committees of political parties. Plaintiffs alleged that those groups circumvented the statute placing limits on individual campaign contributions. 333 F.Supp. at 806. The government's failure to prosecute these alleged violations resulted in the dilution of plaintiffs' participation in the voting process. *Id.* at 808. The court could find no "serious impediment to the plaintiffs' standing." *Id.*

Grounded in the equal protection safeguards of the fifth, rather than the fourteenth, amendment, plaintiffs' claims seem barely distinguishable from those involved in *Baker*. Both cases center on allegations that some arbitrary government action diluted the strength of voters in one group at the expense of those in another. Plaintiffs' injury is no less real because they claim discrimination based on issues rather than geography, nor is it relevant that the impact of allegedly harmful government conduct is felt during the battle over choosing representatives rather than in the number of representatives technically available to the aggrieved voters. The bottom line is that plaintiffs have alleged government action which has improperly biased the political process against the discrete group to which they belong.

the controversy, or blur the presentation of issues ... in any way." *Id.* at 574.

The other organizational plaintiffs nowhere allege that they or their members engage in any political activity or that they are involved in affecting the legislative process in any substantial manner. In the absence of such allegations, these organizations have no standing to represent their members' interests under the voter standing doctrine.

Defendants contend that *Shakman, Shultz* and *Common Cause* incorrectly applied the concept of voter standing as set forth in *Baker v. Carr*. *Baker*, it is said, requires a showing of mathematical dilution of voting strength as a prerequisite of voter standing. Such precision supposedly is necessary to establish concrete personal injury.

The rationale of *Baker*'s standing analysis cannot be so restricted. *Baker*, the three subsequent decisions and the case at bar all concern allegations that some arbitrary government action impaired one group's ability to affect the political process in preference to a more favored group. The injury to oppressed voters is as distinct and palpable here as in any of the previous cases.

The precision with which an injury can be defined is irrelevant to the concreteness of the injury, but that factor may affect considerations of causation or redressability. Defendants contend that the imprecise allegations of harm in the complaint mask its inadequate showing that defendants' actions have caused the harms plaintiffs allege or that an alteration or threatened alteration of the church defendants' tax status will ameliorate plaintiffs' injuries. Defendants' arguments, however, mischaracterize the complaint as objecting to the church's political activity *per se* and seeking relief in the form of a legislatively guaranteed right to abortion.

Plaintiffs have asserted a more circumscribed grievance and request. They do not demand a discontinuation of the church's political activity, nor do they seek, through the court, to prevent the election of anti-abortion candidates. Plaintiffs claim that allegedly unconstitutional government conduct and illegal private conduct have distorted the electoral and legislative process by creating a system in which members of the public have greater incentive to donate funds to the Roman Catholic Church than to politically active abortion rights groups

and in which each dollar contributed to the church is worth more than one given to non-exempt organizations. Plaintiffs do not complain of diminished representation and do not demand increases in actual representation. They complain of arbitrary government interference that disfavors them in the process of selecting representatives.

Viewed as such, there can be no question that, even in the absence of a mathematically demonstrable injury, the complaint satisfies the causation and redressability requirements. Clearly, the government defendants' tax policy is the source of the distortion in the political process that plaintiffs complain of. An injunction against that discriminatory policy will restore the proper balance between adversaries in the abortion debate. The standing question is unaffected by the church defendants' possible resolve to continue their current rate of political activity despite a decision requiring application of § 501(c)(3) to them and it is unaffected by plaintiffs' ultimate chances of success in their drive to preserve or expand women's rights to choose to complete or to terminate a pregnancy. That the court cannot guarantee plaintiffs' success in the political arena does not signify that the plaintiffs cannot gain anything from this litigation. On the contrary, plaintiffs have the opportunity to redress what they perceive is a grievous imbalance in the electoral and legislative process. It is sufficient for purposes of standing that " 'the plaintiff has shown *an* injury to himself that is likely to be redressed by a favorable decision.' *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasis added) .... He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente, supra*, 102 S.Ct. 1682 n.15; *accord, id.* at 1695–96, 1696 n.6 (Rehnquist, J., dissenting).[10]

10. The cases concerning challenges to the validity of the census, which defendants rely upon, are inapposite to an application of standing doctrine to the particular voter claims here. Plaintiffs in those actions alleged that "the votes of persons in some states or regions will be diluted in comparison to those in" other areas if the census was not performed in accordance with strict constitutional mandates. *See Fed'n for Am. Immigration Reform v.*

3. *Equal Protection Standing.* Plaintiffs contend that in addition to having standing based upon injuries to rights guaranteed by the establishment clause and to their right to equal participation in the electoral process, they have standing based upon injuries to rights conferred by the equal protection provisions of the fifth amendment. The thrust and importance of this argument are unclear. Having satisfied the requirements for establishment clause and voter standing, plaintiffs can press their claims of illegal disparate treatment. Thus it appears that the so styled "equal protection" standing would not enhance plaintiffs' position. Moreover, plaintiffs have not alleged any facts that state an injury to rights conferred by the fifth amendment alone. They do not assert that the Code has been applied to them discriminatorily or that they have been denied some tax benefits to which they are entitled. The differential treatment of plaintiffs and the church that plaintiffs complain of creates a legally cognizable injury only in conjunction with plaintiffs' first amendment claims. Their acknowledgement that the Code has been applied properly to them concedes that they have not been injured, in purely fifth amendment terms, by the alleged misapplication to the church defendants. Viewed from this perspective, their "equal protection" claim is reduced to an assertion that the federal defendants are acting improperly. *Schlesinger v. Reservists Comm. to Stop the War, supra,* 418 U.S. at 216–22, 94 S.Ct. at 2929–2932, and *Valley Forge, supra,* 102 S.Ct. at 764 make clear that individuals without a personal stake, distinct from that of the public generally, in the government's observance of the law do not have standing to complain of government malfeasance. Merely asserting, as plaintiffs have done, that the government has disregarded the law in its treatment of a third party does not confer standing.

*Klutznick, supra* 486 F.Supp. at 566; *Sharrow v. Brown,* 447 F.2d 94 (2d Cir. 1971), *cert. denied,* 405 U.S. 968, 92 S.Ct. 1188, 31 L.Ed.2d 243 (1972). Standing was denied in those cases because plaintiffs could not show that they were among those who had sustained the injury or that apportionment in the manner sought would redress the injury. These shortcomings were due to the unique nature of the census method of apportionment.

"[B]ecause of the way our method of apportionment operates" it was "impossible" for plaintiffs in *Fed'n for Am. Immigration Reform* to demonstrate that concrete harm would occur from the inclusion of illegal aliens in the census count. 486 F.Supp. at 570. Assuming that such inclusion would be unconstitutional and would result in a misallocation of some Congressional seats, the court could envision no way in which individual voters could show "which states might gain and which might lose representation." *Id.* at 567–70. Plaintiffs' complaint, thus, was fatally speculative in that it could not include an allegation that any plaintiffs would be affected by the challenged government conduct. *Id.* at 570. In other words, a given voter has no standing to challenge conduct which will injure some unknown and unknowable group of voters. *See id.* at 571.

In *Sharrow,* plaintiff was faced with an exceedingly burdensome, but not impossible, pleading problem. In order to show that his injury might be redressable, he needed to perform "a state-by-state study" of the effects of the claimed impropriety in the census procedures. 447 F.2d at 97. Only such analysis could show that New York was underrepresented as alleged and without this analysis he could not "establish that the failure to enforce [Section 2 of the Fourteenth Amendment] has resulted in a detriment to his rights of representation." *Id.*

The pro-choice plaintiffs need not demonstrate that the alleged discriminatory enforcement of § 501(c)(3) has resulted or will result in a specific loss in the number of pro-choice legislators, and they are not suing merely as members of a group, some of whom are likely to be injured. The *Sharrow* requirement is inapplicable because these plaintiffs allege unequal ability to *participate* in the electoral process, not actual loss of representatives vis-a-vis other groups, and they seek a non-discriminatory enforcement of the laws, not an increase in the number of offices available. The court can act upon their injury and demands without the type of statistical information required to prove injury and to structure relief in a census case. Unlike plaintiffs in *Fed'n for Am. Immigration Reform,* these voters all allege particular personal injury. This is no general claim that the census will come out "wrong" and thus harm some voters and help others. Rather, these plaintiffs allege that *all* pro-choice voters, candidates and contributors have suffered the injury complained of and will benefit from the relief requested. Assuming the truth of their pleadings, each plaintiff in this category has shown particular interests at stake and likelihood of benefiting from the relief sought.

## B. Prudential Concerns

■ The twenty individual plaintiffs and three of the organizational plaintiffs, ARM, NWHN and Nassau-NOW, have satisfied the Article III requirements for voter standing. In addition, the clergy plaintiffs and the Women's Center have satisfied those constitutional prerequisites for establishment clause standing. Before a final decision on these parties' standing can be rendered, however, they must demonstrate that the court should not decline to confer standing because of prudential considerations. The Supreme Court has identified three such prudential limitations that will defeat the standing of a plaintiff who has satisfied the Article III case or controversy requirements. Where "the harm asserted amounts only to a generalized grievance shared by a large number of citizens in a substantially equal measure," the exercise of federal jurisdiction is not warranted. *Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 80, 98 S.Ct. at 2634. Access to federal courts may be denied also when a plaintiff seeks to assert the legal rights of a third party. *Id.* Finally, the judiciary should avoid hearing "abstract questions of wide public significance [when] other governmental institutions may be more competent" to do so. *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. at 2205.[11]

■ These prudential factors do not dictate barring plaintiffs' opportunity to proceed with this lawsuit. Although a large number of citizens likely share the injuries alleged by the clergy under the establishment clause and by the voters and abortion rights organizations under the first and fifth Amendments, these are not "generalized grievances" such that there will be any lack of sharp controversy. Standing is not a doctrine to restrict access to the courts, and prudential concerns should not be so applied if the court is satisfied that plaintiffs bring a live and pointed controversy to it. *See, e.g., Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 80–81, 98 S.Ct. at 2634–2635 ("Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested," prudential concerns generally do not bar standing); *United States v. SCRAP, supra,* 412 U.S. at 687–88, 93 S.Ct. at 2415–2416 ("standing is not to be denied simply because many people suffer the same injury.") Standing rules should be invoked to ensure that the court will adjudicate only an actual case or controversy and that, as an adversarial rather than an inquisitorial tribunal, it will be fully apprised of the facts and relevant law by a vigorous and interested presentation from the litigants. There is not the slightest reason to believe that the wide dispersion of plaintiffs' injuries will diffuse the contest before the court.

11. Defendants suggest that as part of the prudential limits on standing plaintiffs must show that they are within the "zone of interests" that § 501(c)(3) protects. Plaintiffs fail this zone of interests test, defendants maintain, because Congress never intended § 501(c) to preserve government neutrality in the electoral process. The structure of § 501(c) creates inequality among organizations depending upon the exemption for which each qualifies. For example, § 501(c)(3) organizations enjoy tax exemptions and the right to receive tax-deductible contributions at the cost of foregoing all electioneering and limiting their lobbying efforts to an insubstantial part of their activities; § 501(c)(4) organizations are not subject to these stringent requirements but they too are ineligible for tax-deductible contributions; and § 501(c)(19) must observe few restrictions on their political endeavors while enjoying tax benefits equivalent to those conferred on § 501(c)(3) groups. Plaintiffs' standing, however, is not undermined by the fact § 501(c)(3) is not a general safeguard against tax policy induced economic distortions of the political marketplace because the zone of interests, or nexus text, applies only to taxpayer suits. *See Duke Power Co. v. Carolina Env. Study Group, supra,* 438 U.S. at 78–80, 98 S.Ct. at 2633–2634. Plaintiffs already have conceded that they do not have taxpayer standing. *See* note 1, *supra.*

The failure of § 501(c) to preserve neutrality in government intervention into the political process has caused the United States Court of Appeals for the District of Columbia Circuit to declare the statutory scheme in violation of the Constitution. *See Taxation with Representation of Washington v. Regan,* 676 F.2d 715 (D.C.Cir.1982) (*en banc*).

The prudential limitation on standing when rights of third parties are implicated avoids "adjudication of rights which those not before the Court may not wish to assert . . . [and assures] that the most effective advocate of the rights at issue is present to champion them. *See Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2873–2874, 49 L.Ed.2d 826 (1976)." *Duke Power Co. v. Carolina Env. Study Group, supra*, 438 U.S. at 80, 98 S.Ct. at 2634. This lawsuit does not present the potential problem of a disinterested plaintiff advocating the interests of persons not before the court. Plaintiffs do not predicate their standing on the narrow *jus tertii* exceptions to the general rule that litigants must assert their own rights. The action, therefore, involves no rights that the rightholder would not wish to assert or that the plaintiffs are likely not to press vigorously.

The final prudential hurdle restricts access to judicial forums to resolve abstract policy questions of broad public importance. Courts erect this barrier from their awareness of the judiciary's limited competence to resolve societal, as opposed to personal, disputes and the superiority of other mechanisms to make complex social choices. Not all issues of broad public importance, however, are necessarily, or even better, left to the executive and the legislature. Plaintiffs do not seek resolution of "abstract questions;" they have articulated particular improper actions by the church defendants and illegal and unconstitutional disregard for that activity by the government defendants. Although the complaint implicates social policy issues, it does not call for judicial selection of an appropriate policy. Congress already has made that choice and set out the correct policy in § 501(c)(3); plaintiffs ask only for a judicial determination of whether defendants have observed Congress's commands concerning paying taxes and engaging in political activity. The prudential barriers do not restrict a court from adjudicating such a claim merely because of the interplay between the litigation and social controversy.

## III

Defendants urge dismissal, even if plaintiffs do have standing, because the complaint does not state a claim upon which relief may be granted. Defendants contend that plaintiffs' injuries, such as they are, do not amount to actionable wrongs either as establishment of religion or unconstitutional vote dilution. The church defendants further argue that regardless of the vitality of the complaint, it states no claim against them and that, therefore, they should be dismissed.

Plaintiffs are permitted to proceed "unless it appears beyond doubt that [they] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Measured by this standard, counts two and three of the complaint certainly are adequate and the motion to dismiss them for failure to state a claim must be denied. Counts one and five, however, are fatally defective and must be dismissed. Plaintiffs have voluntarily withdrawn count four.

In count two of the amended complaint, plaintiffs allege that by granting the Roman Catholic Church a uniquely favored status under the tax code, the government defendants have violated their duty, arising under the first amendment, to treat all religious organizations similarly. In recent years, the Supreme Court has set out a three part test to determine establishment clause violations. A challenged government action withstands establishment clause scrutiny "if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." *Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *accord, Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–2112, 29 L.Ed.2d 745 (1971); *Brandon v. Bd. of Education*, 635 F.2d 971, 978 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 970, 71 L.Ed.2d 109 (1982).

It is not implausible that plaintiffs will be able to adduce facts that demonstrate that the government favoritism allegedly shown to the defendants lacks secular purpose or that this preferential treatment advances the cause of the Roman Catholic Church. If plaintiffs are successful in either of these tasks, they will have demonstrated an actionable establishment clause violation. The difficult evidentiary burdens that plaintiff must shoulder to prove these allegations do not, by themselves, justify dismissal.[12]

Defendants place undue reliance on *Walz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), in their argument that the tax benefits plaintiffs complain of do not rise to the level of actionable injuries. In *Walz*, there was no assertion of preferential treatment of one religion to the detriment of others. *See id.* at 673, 90 S.Ct. at 1413; *id.* at 689, 90 S.Ct. at 1421 (Brennan, J., concurring); *id.* at 696, 90 S.Ct. at 1425 (Harlan, J., concurring). The dictum, "[t]here is no genuine nexus between tax exemption and establishment of religion[,]" *id.* at 675, 90 S.Ct. at 1414, and the accompanying distinction between the transfer of funds to churches and abstaining from collecting taxes from them, *id.* at 674–75, 90 S.Ct. at 1414–1415, are applicable only in the context of a nondiscriminatory tax deduction extended broadly to social welfare organizations. In that circumstance, the state, by declining tax collection from all churches, observes the "wholesome neutrality" commanded by the establishment clause; taxing church property or income while all other private corporations operated for the public benefit were granted an exemption would constitute hostility to religion that the first amendment forbids. *Walz v. Tax Comm'n of the City of New York, supra*, 397 U.S. at 696–97, 90 S.Ct. at 1425–1426 (Harlan, J., concurring). When, as here, the government conditions that tax advantage on abstinence from the political arena, but

waives that condition for a single religious group, the waiver, rather than the exemption itself, runs afoul of the Constitution. Even if the "tax subsidy" granted through § 501(c)(3) is not establishment *per se*, the preferential treatment shown to one religious group carries the appearance of an improper endorsement of sectarian belief.

In count three, plaintiffs allege a violation of their fifth amendment rights to due process, including equal protection of the laws, by the government defendants' failure to revoke the church's § 501(c)(3) status. The gravamen of this claim is the adverse impact on the plaintiffs' political voice that results from the government's financial sponsorship of the plaintiffs' opponents in a bitter public controversy. *Baker v. Carr, supra*, and its progeny confirmed that individuals have a right to equal participation in the electoral process and to be free from arbitrary government action that favors the political strength of some persons relative to others. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 554–68, 84 S.Ct. 1362, 1377–1384, 12 L.Ed.2d 506 (1964); *Shakman v. Democratic Organization of Cook County, supra*, 435 F.2d at 270; *Tax Analysts and Advocates v. Simon, supra*, 376 F.Supp. at 899. The defendants concede the existence of this right, but they argue that it is limited to protection against mathematical dilution of the vote. This reiteration of the argument made against the plaintiffs' claim of voter standing fails for the reasons similar to those found to support that standing. *See* pp. 480–483 *supra*. The *Baker* opinion evinces no indication that the right it recognized is fact-bound to the circumstances of the case. If the plaintiffs can prove that the government defendants have conferred a financial benefit on the church and that the benefit disadvantages the plaintiffs in electoral contests, then the plaintiffs will have made a prima facie case for relief. Congress is not free to subsidize the lobbying or electioneering activities of

---

12. The neutrality of the statute itself, of course, does not immunize defendants if they apply that statute in a manner that favors one religion over all others. *See, e.g., Fowler v. Rhode Island*, 345 U.S. 67, 69, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953); *Niemotko v. Maryland*, 340 U.S. 268, 271–73, 71 S.Ct. 325, 327–328, 95 L.Ed. 267 (1951).

one group while arbitrarily denying the subsidy to others. *Taxation with Representation of Washington v. Regan, supra,* at 716. Similarly, the administrators of our laws are not free to condition the grant of a subsidy upon total abstinence from campaigning and minimal engagement in lobbying and then, without reason, to exempt one group from that requirement while allowing it the subsidy.[13]

In count five, plaintiffs seek a writ of mandamus to compel the government defendants to enforce the Code against the church defendants. It is firmly established that ordinarily mandamus relief is available only to compel ministerial administrative actions. *See e.g., Leonhard v. Mitchell,* 473 F.2d 709, 712–13 (2d Cir.), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973); *Lovallo v. Froehlke,* 468 F.2d 340, 343, 345–46 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973). It is equally accepted that discretion permeates IRS tax assessment and collection decisions. *See e.g., Bob Jones Univ. v. Simon,* 416 U.S. 725, 749–50, 94 S.Ct. 2038, 2052–2053, 40 L.Ed.2d 496 (1974); *American Ass'n of Commodity Traders v. Dep't of Treasury,* 598 F.2d 1233, 1235 (1st Cir. 1979). Accordingly, mandamus is an inappropriate remedy in this action.

Count one states simply that "[t]he activities of the Roman Catholic Church violate § 501(c)(3) of the Code and the First Amendment to the Constitution." This count fails to state a claim against the church defendants because they are incapable of violating the first amendment and they have breached no duty imposed by the Code and to plaintiffs.

The constitutional prohibition against establishment of religion prohibits government activities that enhance the status of one theology over all others or the status of religious beliefs and organizations generally over non-religion. Like all other protections afforded by the Bill of Rights, this stricture does not restrict purely private corporate action. Admittedly, the line between the public and the private is indistinct and, some say, vanishing, but the activities of the Roman Catholic Church, as alleged in the amended complaint, do not even approach this disputed border. Therefore, no action can proceed against the church defendants based on their abridgement of plaintiffs' first amendment, guaranteed rights.

The complaint also fails to state a violation of § 501(c)(3) by the church defendants. They have received a determination letter from the IRS that confirms their tax-exempt status. Even if, as plaintiffs contend, that letter was erroneously or illegally issued, the church is entitled to rely upon it and withhold payment of taxes. The Code imposes no duty upon the church to gain pre-clearance from the IRS before embarking on activities that might trench upon the § 501(c)(3) prohibitions against political activity. If the church does engage in these proscribed endeavors, then it is liable to revocation of its exemption, but as long as it holds that exemption, it cannot be said to have violated the Code.

Moreover, the plaintiffs, by their own admission, have no direct grievance with the church defendants. The injuries set out in the complaint arise from illegal and unconstitutional government action. Plaintiffs concede that they do not seek to terminate the Roman Catholic Church's political program; they desire to place the church on an equal footing with themselves in the political battle over the right to choose to have an abortion. The disadvantage plaintiffs suffer comes from government indifference to church excesses and it is against the government, not the church, that plaintiffs have stated a claim.

---

**13.** The court makes no judgment at this time on the appropriate standard of review for these claims. The Court of Appeals for the District of Columbia Circuit recently applied the strict scrutiny test to claims, analogous to those at bar, that § 501(c) of the Code facilitated the speech of some persons over others. *See Taxation with Representation of Washington v. Regan, supra,* at 723–731.

## IV

Defendants' final assault on the action flows from statutory and common law prescriptions against judicial review of plaintiffs' claims. Defendants contend that the doctrine of non-reviewability of certain administrative or prosecutorial decisions precludes consideration of the action. In addition, defendants maintain that Congress has explicitly excluded lawsuits such as this from those in which injunctive or declaratory relief is available.

### A. *Reviewability of Administrative or Prosecutorial Discretion*

 As a general rule, courts will review administrative actions in the absence of a clear and convincing showing of contrary legislative intent. *Eastern Ky. Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1285 (D.C.Cir.1974), *vacated on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Medical Comm. for Human Rights v. Sec. & Exch. Comm'n*, 432 F.2d 659, 666 (D.C.Cir.1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), *citing Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967). Tempering this presumption is the recognition of a generous grant of discretion to the executive, particularly in decisions to prosecute law violators. *See, e.g., Marshall v. Jerrico*, 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980); *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974); *Kixmiller v. Sec. & Exch. Comm'n*, 492 F.2d 641, 645 (D.C.Cir.) (1974).

 This action fits much more closely within the rule allowing review than the rule excluding it. No statute explicitly bars all judicial review of IRS decisions concerning taxpayer status.[14] To the contrary, Congress recently added to the Code a section explicitly permitting judicial review of IRS decisions denying an organization § 501(c)(3) status. *See* Pub.L. 94–455, Title XII, § 1203(b)(2)(A), 90 Stat. 1690 (1976), codified at 26 U.S.C. § 7428 (1976).[15] The jurisdictional restrictions contained in this section of the Code—limiting § 7428 suits to taxpayer actions for declaratory relief—do not undermine the inference that Congress recognizes the *competence* of the judiciary to reevaluate and where necessary to supervise IRS decisions concerning the award of § 501(c)(3) status. There is no significant difference in the decisional task presented to the courts in determining whether an organization has improperly been denied an exemption and in determining whether it has improperly been granted one. Both decisions require consideration of complex federal revenue collection policies. Both require delving into the nature of the taxpayer, its expenditures and its activities. Neither is susceptible to simple application of rules to facts.

Defendants place undue reliance on the doctrine of non-reviewable prosecutorial discretion. Their most compelling argument draws upon the deference courts show to executive decisions to allocate law enforcement resources in a manner that the executive deems most efficacious. Offsetting this resource efficiency argument, however, is the consistent judicial intervention into prosecutorial decisions that fail "to promote the ends of justice and den[y] rights conferred upon a citizen by the Constitution and by federal law." *NAACP v. Levi*, 418 F.Supp. 1109, 1116 (D.D.C.1976); *see Nader v. Saxbe*, 497 F.2d 676, 679 n.19 (D.C.Cir.1974); *Adams v. Richardson*, 480 F.2d 1159, 1166 (D.C.Cir.1973). Moreover, this action is distinguishable from the ordi-

---

14. As discussed *infra*, pp. 489–90, the Anti-Injunction Act, 26 U.S.C. § 7421(a) (1976), and the Declaratory Judgment Act, 28 U.S.C. § 2201 (Supp. IV 1980) restrict the scope of remedies available in tax related controversies. Neither of these statutes, however, can be construed as a blanket preemption of judicial review of taxpayer status. They are limitations on remedies only.

15. Section 7428 authorizes certain organizations whose application for tax-exempt status is denied or revoked to bring an action for judicial declaration of the organization's entitlement to the exemption. *See* 26 U.S.C. § 7428 (1976).

nary instance of unreviewable prosecutorial discretion where the executive must choose from among many malfeasors those against whom it will enforce the law. Here, by contrast, the plaintiffs seek to compel the government to conform its actions to the law. They do not sue, for example, under a statute that criminalizes certain private behavior nor do they complain that the executive has failed to penalize a third party's violation of that statute. Rather plaintiffs allege that the IRS has illegally acted to bestow a tax benefit upon an unqualified organization. Plaintiffs do not seek to force the executive to expend its resources to prosecute a law violator; they are using their own resources to compel the government defendants to observe Congressionally and constitutionally imposed strictures on defendants' official actions. In sum, this case presents almost none of the circumstances that give rise to judicial deference to prosecutorial discretion.

### B. *The Anti-Injunction Act*

■ The Code expressly prohibits, with certain exceptions not relevant here, all "suit[s] for the purpose of restraining the assessment or collection of any tax . . ." 26 U.S.C. § 7421(a) (1976). Defendants contend that this litigation falls within the prohibited category.

Reference to the words of the statute alone places plaintiffs' case beyond its purview. The complaint seeks an injunction commanding, not forbidding, the collection of taxes. Peering behind the words provides no greater support for defendants' position.

This section of the Code, known as the Anti-Injunction Act, apparently has no recorded legislative history. *Bob Jones Univ. v. Simon, supra,* 416 U.S. at 736, 94 S.Ct. at 2045. Courts have interpreted the statute as ". . . the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference. . ." *Id.; see Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962). Defendants argue that this governmental need to ensure an unimpeded flow of revenue can be frustrated by suits, such as the case at bar, that challenge taxpayer status and compel tax collection because such suits place demands upon the IRS equivalent to actions to restrain collection. This argument is not without some merit, particularly because a successful third party action compelling tax assessment will likely be followed by a taxpayer suit under 26 U.S.C. § 7428 seeking a declaration of entitlement to an exemption. Such litigation over the right of an organization to enjoy certain privileges under the Code has the potential to encumber substantial IRS resources even if it does not directly interfere with the flow of revenue.

The majority of the courts that have considered the scope of the Anti-Injunction Act, however, have declined to interpret its prohibitions as broadly as defendants suggest. The consistent theme in these decisions is that the statute only extends to those actions it expressly refers to and that its effect is to require that taxpayers who object to the payment of taxes pay the assessment and sue for a refund. *See, e.g. Wright v. Regan,* 656 F.2d 820, 836 n.52 (D.C.Cir.1981), *petition for cert. filed,* 50 U.S.L.W. 3467 (Dec. 12, 1981) (No. 81–970); *Tax Analysts and Advocates v. Shultz, supra,* 376 F.Supp. at 891–92; *Eastern Ky. Welfare Rights Organization, supra,* 506 F.2d at 1284; *McGlotten v. Connally,* 338 F.Supp. 448, 453–54 (D.D.C.1972) (three judge court). Persuasive reasoning supports these decisions. Third party suits to compel tax collection as a means to vindicate plaintiffs' rights do not pose the threat of clogging the federal revenue pipeline that taxpayer-sought injunctions would present because third party suits are " 'few and far between[.]' " *Wright v. Regan, supra,* 656 F.2d at 836 n.52. The Anti-Injunction Act would have a draconian effect beyond what Congress explicitly required if it were applied in these circumstances because it would foreclose any relief to third parties injured by executive decisions not to assess or collect taxes. The taxpayer who is unable to prevent collection because of the Act has open to it an alternative avenue

of relief—a suit for refund. Plaintiffs here, and any person having a right to complain of another's lack of tax liabilities, by contrast, would have no means of redress if the Act preempted this lawsuit. *See Bob Jones Univ. v. Simon, supra,* 416 U.S. at 746, 94 S.Ct. at 2050; *National Restaurant Ass'n v. Simon,* 411 F.Supp. 993, 996 (D.D.C.1976); *McGlotten v. Connally, supra,* 338 F.Supp. at 453–54. In light of the clear language of the statute and the strong and compelling authority limiting application of the statute to actions to restrain tax collection, plaintiffs are not barred from proceeding by the Anti-Injunction Act.

## C. *The Declaratory Judgment Act*

 In addition to their prayer for an injunction, plaintiffs seek a declaration that defendants have violated the Code and Constitution. The Declaratory Judgment Act confers jurisdiction on the court to issue such relief "except with respect to [controversies concerning] Federal taxes other than the actions brought under Section 7428 of the Internal Revenue Code of 1954, . . ." 28 U.S.C. § 2201 (Supp. IV 1980).

Conceding that they cannot bring a § 7428 action, plaintiffs change hats from those of the strict constructionists who advocated a literal reading of the Anti-Injunction Act to those of contextualists who argue that that statute and the Declaratory Judgment Act share the same purpose and thus should be interpreted to be coextensive. Plaintiffs' only support for this proposition is dicta from several opinions that interpreted the two laws as "coterminous." *McGlotten v. Connally, supra,* 338 F.Supp. at 453; *see Bob Jones Univ. v. Simon, supra,* 416 U.S. at 733 n.7, 94 S.Ct. at 2044 n.7 (Declaratory Judgment Act restriction is "at least as broad as the Anti-Injunction Act"). Plaintiffs' authorities do not support the broad proposition that any tax case ripe for injunctive relief also is ripe for declaratory relief; those cases stated only that it appeared that Congress intended to exclude from the Declaratory Judgment Act *at least* those cases, other than § 7428 actions, that could not be brought because

of the Anti-Injunction Act. *See Bob Jones Univ. v. Simon, supra,* 416 U.S. at 733 n.7, 94 S.Ct. at 2044 n.7.

Declaratory relief and injunctive relief are two different forms of the courts' remedial powers; there is no inherent reason that the two should be interpreted as equal in scope. Congress extended the Declaratory Judgment Act and created the § 7428 remedy in response to the *Bob Jones Univ.* decision. *See* S.Rep.No.94–938, 94th Cong., 2d Sess. 586–87, *reprinted in* [1976] U.S. Code Cong. & Ad.News 3439, 4010–11. Nothing in the wording that Congress chose to allow these taxpayer suits for a declaration of a right to § 501(c)(3) status indicates that it desired to define the scope of the available remedy in terms of judicially recognized exceptions to the Anti-Injunction Act. The different purposes of the declaratory and the injunctive remedies— the former allows a litigant to seek an order from the court before subjecting itself to liability, for example, by not paying taxes, while the latter more often is invoked to terminate ongoing injurious activity—suggests that the absence of cross-references between the Declaratory Judgment and Anti-Injunction Acts resulted from a conscious tailoring of each to the circumstances Congress thought most befitting. The Anti-Injunction Act, by its narrow wording, permits suits to compel collection of taxes; such suits will be brought by parties whose tax status is not in dispute in the litigation and who, as plaintiffs here, can have standing only if they can show that a third party's privileged tax status imposes on them a discrete and palpable injury. At that point the opportunity for a declaration of rights would be surplusage. The party seeking to adjudicate its own tax status presents a very different injury, the denial of an exemption from future taxation. A declaration of its right to the exemption can prevent it from suffering any permanent damage, but allowing such a party to seek an injunction would interrupt collection of federal revenues and thereby promote the principal mischief Congress sought to prevent through the Anti-Injunction Act. This analysis supports defend-

ants' position that no declaratory relief is available to plaintiffs.

## V

Pursuant to the preceding discussion, the motion to dismiss is granted in part and denied in part. The church defendants motion to dismiss themselves from the lawsuit is granted. Plaintiffs Laurel Clinic, Inc., The Federation of Feminist Women's Health Centers, Inc., Harrisburg Reproductive Health Services, Inc., Hagerstown Reproductive Health Services, Inc., and Women's Health Services, Inc. are dismissed for lack of standing. The motions to dismiss the other plaintiffs are denied. The twenty individual plaintiffs have standing as voters to contest the alleged infringement of their right to participate in the political process on equal terms with all others and free from arbitrary government interference. ARM, Nassau-NOW, and the National Women's Health Network, Inc. have standing to represent their voter-members injured by the challenged government conduct. In addition, the clergy plaintiffs and the Women's Center for Reproductive Health have satisfied the requirements to bring an action complaining of an unconstitutional establishment of religion. The motions to dismiss for failure to state a claim upon which relief may be granted or because the action is barred by the Anti-Injunction Act or the doctrine of administrative discretion are denied. The court finds that the Declaratory Judgment Act does not authorize relief in this action.

IT IS SO ORDERED.